UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

―――――――――――――――――――――――――

United States of America,

               Appellee,

               v.               Docket No. 25-1114-cr

Dilbar Gul Dilbar,

               Appellant.

―――――――――――――――――――――――――

## OPPOSITION TO MOTION FOR A STAY PENDING APPEAL

Defendant-Appellant Dilbar Gul Dilbar moves for a stay of the district court's order of detention pending appeal. At the outset, the procedural posture of this case is unusual as Dilbar already has been detained and the district court's detention order thus is fulfilled. It is therefore unclear what a stay would do in this matter as opposed to, say, a motion for release pending trial or an appeal of the detention order itself. In any event, for the reasons set forth herein, the Court should deny Dilbar's motion.

To assist the Court in a determination of the issue presented by Dilbar's motion, attached hereto are the following exhibits:

Exhibit 1 – Complaint

Exhibit 2 – May 9, 2025, Transcript of Proceedings

Exhibit 3 – May 13, 2025, Transcript of Proceedings

Exhibit 4 – May 29, 2025, Transcript of Proceedings

## BACKGROUND

### A.    Dilbar Is Alleged to Have Committed Visa Fraud

On April 29, 2025, Dilbar Gul Dilbar was charged by criminal Complaint with violating 18 U.S.C. § 1546(a), Visa Fraud. (Exhibit 1, p. 1). The Complaint alleged the following.

Dilbar was a citizen of Afghanistan and his Afghan identification documents, including his Afghan passport, were issued initially under the name "Dilbar Gul Taj Ali Khan." (*Id.*, p. 2). Beginning around 2020, however, Dilbar began using the name "Dilbar Gul Dilbar," which was reflected in a second Afghan passport and a national ID card. (*Id.*). This is also the name Dilbar later used to obtain a New York State driver's license. (*Id.*).

The Afghan Special Immigrant Visa ("SIV") Program offered admission to the United States to Afghan nationals who supported the United States and its allies during the war in Afghanistan by serving in qualified employment for at least two years. (Exhibit 1, pp. 3–4). An application for an Afghan SIV must include a Letter of Recommendation from a person associated with the U.S. Government or the International Security Assistance Force who has personal knowledge of the applicant's qualifying employment. (*Id.*, pp. 3–5). With a valid

Letter of Recommendation, the applicant must then apply for a "Chief of Mission" approval letter, obtained from the Embassy, before submitting the application. (*Id.*, p. 6). Once received, the applicant must complete a United States Citizenship and Immigration Services ("USCIS") Form I-360 which includes an attestation under penalty of perjury that, *inter alia*, all information is "complete, true, and correct at the time of filing." (*Id.*, p. 4).

In July 2016, Dilbar applied to the United States Department of State for a United States Embassy Kabul Chief of Mission approval letter for an Afghan SIV. (*Id.*, p. 5). In August 2017, the Department of State denied Dilbar's application for a Chief of Mission approval letter, noting that it was unable to verify the authenticity of the Letter of Recommendation Dilbar had provided. (*Id.*, p. 6). Despite the denial letter, Dilbar continued to pursue an SIV. (*Id.*).

In November 2017, Dilbar signed USCIS Form I-360, a required part of the SIV application, including signing the requisite attestation under penalty of perjury, and included a counterfeit Chief of Mission approval letter dated August 10, 2017. (Exhibit 1, pp. 6–8). Dilbar then submitted his SIV application. (*Id.*, pp. 7–8). The SIV application was denied on or about January 23, 2018. (*Id.*, pp. 8).

In 2021, Dilbar reapplied for an SIV. (Exhibit 1, p. 8). As part of his second application, Dilbar included a purported letter of employment from a United

States-based company, a Letter of Recommendation signed by Manuel Ray James, and another USCIS Form I-360 for which Dilbar signed the required attestation under penalty of perjury. (*Id.*, pp. 8–10). On or about March 20, 2024, Dilbar's SIV application was approved, and Dilbar was granted admission to the United States on April 4, 2024. (*Id.*, p. 10). That same day, April 4, 2024, Dilbar applied for a Legal Permanent Resident card, which he received on July 22, 2024. (*Id.*, p. 11).

The Department of State has determined that the United States-based company Dilbar used was engaged in a large-scale scheme to provide fraudulent employment documents for a fee, and that similarly, Manuel Ray James was involved an "advance-fee" scam through which he sold fraudulent immigration documents to unqualified aliens. (*Id.*, pp. 9–10).

### B. The Magistrate Judge Conducts a Detention Hearing and Orders Dilbar's Release.

At Dilbar's initial appearance on May 1, 2025, the government moved to detain Dilbar under 18 U.S.C. § 3142(f)(2)(A) on the grounds that there was a serious risk of flight. (W.D.N.Y. Docket No. 25-mj-4055, Minute Entry 5/1/25). Before the detention hearing, the United States Probation Office prepared a Pretrial Services report which concluded that there was no condition or combination of conditions that would assure Dilbar's appearance, and thus recommended detention. (Exhibit 2, p. 25).

4

### 1. The Government's Proffer

At the hearing, the government proffered the following additional information. Between 2009 and 2011, Dilbar worked as a translator in Afghanistan, but he was terminated prior to reaching the requisite two full years. (Exhibit 2, p. 3). When Dilbar submitted his first SIV application in 2016, the Chief of Mission approval letter he had included was determined to be a forgery and his application was denied. (*Id.*, p. 4). Dilbar subsequently reached out to various companies with operations in Afghanistan with whom he had never been employed, but nevertheless told the companies he had been an employee and requested an employment letter. (*Id.*, p. 5). Dilbar used different names and dates of birth, apparently hoping one of those companies had bad enough record-keeping that they would not realize he never worked for them; each denied his request. (*Id.*).

When this tactic failed, Dilbar purchased the fraudulent employment letters from the United States-based company and Manuel Ray James. (*Id.*, pp. 5–6). Further, Dilbar's email records showed him communicating with James about the letter of recommendation and the Department of State's efforts to verify its authenticity. (*Id.*, p. 6).

Importantly, the visa application asks the applicant, under penalty of perjury, whether he or she has ever previously been denied a visa; when Dilbar

5

completed his second Afghan SIV application, Dilbar lied and answered "no." (*Id.*, p. 7). If he had told the truth and admitted that he was previously denied an Afghan SIV in 2016, his 2021 application never would have been granted. (*Id.*). And as a derivative of Dilbar's Afghan SIV—which was obtained by fraud—his wife and children were also granted visas. (*Id.*).

One of the first things Dilbar did when he arrived in the United States was apply for a New York State license to act as a security guard for public events— a serious concern because Dilbar was thereby seeking enhanced access to public spaces and events. (Exhibit 2, p. 7). Moreover, since arriving in the United States, Dilbar continued to be in contact with Manuel Ray James, the individual who falsified his second letter of employment. (*Id.*, p. 8).

Dilbar's phone records showed that, since arriving in the United States, he has been in contact with a second individual who was being investigated for largescale fraud related to the Afghan SIV program. (*Id.*). And finally, when law enforcement searched Dilbar's residence, they found visa and identity documents belonging to other Afghan nationals, who do not live in that residence, and for which there appeared to be no legitimate reason for Dilbar to possess them. (*Id.*).

### 2. The 18 U.S.C. § 3142(g) Factors

The government also argued that the 18 U.S.C. § 3142(g) factors weighed against release. First, the nature and circumstances of the crime, visa fraud, were extremely serious as this type of fraud undermines national security and confidence in the visa process for other applicants. (Exhibit 2, p. 9). Second, the government had proffered ample proof of five instances in which Dilbar engaged in fraud to obtain his visa and green card, only one of which would be necessary to sustain a conviction in this case. (*Id.*). Third, Dilbar's history and characteristics showed that he had only lived in the area for a year, and his only family were his wife and children whose visas were obtained as a result of Dilbar's alleged fraud. (*Id.*, pp. 9–10). And fourth, the nature and seriousness of the danger to the community weighed against release because "the visa program has extensive vetting procedures for a reason. When people lie to avoid those vetting procedures, they are inherently placing our country at risk." (*Id.*, p. 12).

The government also observed that even if Dilbar was simply desperate to flee Afghanistan, he would be similarly desperate to avoid going back to that country (*id.*, p. 11), and that facing a maximum sentence of 10 years' imprisonment would create additional incentive to flee (*id.*, p. 31).

### 3. Dilbar is Ordered Released

The magistrate judge held the case over to May 13, 2025, to render her decision. (Exhibit 3). The magistrate judge began by summarizing the legal standards and the government's motion to detain based on risk of flight. (*Id.*, pp. 5–6).

The magistrate judge found that the government had met its burden of demonstrating by a preponderance of the evidence that there was a "serious risk" that Dilbar might flee, and that of particular concern to the court was that law enforcement found visas and identification belonging to other Afghan nationals in Dilbar's home. (*Id.*, pp. 6–8). Moreover, Dilbar had motive to flee based on the serious charge and potential collateral consequences of a conviction. (*Id.*, p. 8).

In considering the § 3142(g) factors, the magistrate judge noted that it "was not an easy or clearcut decision. There are factors and evidence tipping in both directions." (*Id.*, p. 13). However, largely in consideration of Dilbar's lack of a criminal history, the low Sentencing Guidelines range that would likely apply in the event of a conviction, and the modest financial resources available to Dilbar, the magistrate judge concluded that "while Mr. Dilbar presents a serious risk of flight, that risk can be appropriately managed with conditions." (*Id.*, p. 13).

The magistrate judge imposed the following conditions: home detention with location monitoring; travel limited to within Monroe County, New York; financial monitoring; computer monitoring; mental health evaluation and treatment, if warranted; fully secured $6,000 cash bond; if the application for a security license was still pending, it must be withdrawn or immediately surrendered; surrender of his passport and minor children's passports; execution of an "Irrevocable Waiver of Extradition;" report to pretrial services; prohibition on alcohol; prohibition on possession of firearms or other weapons; mandatory reporting of any contact with law enforcement personnel within 72 hours; and appointment of a third-party custodian. (Exhibit 3, pp. 13–18).

At the government's request, the magistrate judge stayed her Release Order until 5:00PM on May 14, 2025, to allow the government to request a stay from the district court pending its review. (*Id.*, p. 24).

## C. The Government Appeals to the District Court, which Orders Dilbar's Detention.

The district court denied the motion to stay the Release Order but scheduled a detention hearing for May 29, 2025. (W.D.N.Y. Docket No. 25-mr-6065, Dkt. 3). In advance of the hearing, the government proffered additional information that Dilbar posed a risk of flight.

The government alleged that, according to the Terrorist Explosive Device Analytical Center ("TEDAC"), in 2011, the Department Defense obtained

evidence from a crime scene in Afghanistan. (W.D.N.Y. Docket No. 6:25-mr-6065, Dkt. 5, p. 1). One of the unclassified pieces of evidence was a handwritten note with a series of letters and numbers, possibly the coordinates of a planned terrorist attack, on which Dilbar's fingerprint was found. (*Id.*). That same year, Dilbar was arrested for impersonating an Afghan National Police criminal investigator, though for purposes of this case, the government had been unable to determine the outcome of that arrest. (*Id.*, p. 2). However, Dilbar's application to work as an interpreter in 2013 was denied as a result of that arrest. (*Id.*).

Moreover, the government proffered that in 2018, Dilbar had a series of contacts via social media with Mohammad Musa Khawrin. (*Id.*). Khawrin was associated with Hezb-e Islami Gulbuddin and maintained connections with senior Taliban officials in Qatar as well as the Haqqani Network, which was known to stoke anti-American sentiment in Afghanistan. (*Id.*).

The government proffered that the ongoing investigation also revealed that Dilbar continued to be in contact with another person whom law enforcement believed was the same person who identified himself as "Manuel Ray James" and falsified Dilbar's second letter of employment. (*Id.*, p. 4). Before arriving in the United States, Dilbar had sent "Ray James" a United States government-issued identification badge with Dilbar's brother's picture and identifying information even though, to the government's knowledge, that

brother was still in Afghanistan at the time. (*Id.*). Since arriving in the United States, Dilbar had also sent "Ray James" a picture of an account and routing number—a practice the government proffered is one that criminals use to make discrete payments, including international payments. (*Id.*).

Finally, the government noted new information that showed the inadequacy of the conditions of release, including:

- In the Bail Report, Dilbar only disclosed a checking account, a savings account, and a single credit card. He did not disclose that he has accounts with Coastal Community Bank (OnePay), PayPal (Venmo), GreenDot (Apple Cash), and Goldman Sachs (Apple Credit). Moreover, USPO's financial monitoring will not capture any transactions Dilbar would make using cash, MoneyGram, Western Union, or other informal channels to send or receive money while on pretrial supervision. (*Id.*, p. 9).

- Dilbar did not call his wife or the individual serving as the third-party custodian for at least 6 days after he was initially incarcerated. He did, however, call another associate half a dozen times in in the first 10 days of his detention. (*Id.*, p. 7, n. 3).

At the detention hearing on May 29, 2025, the government further elaborated on its proffer. (5/29/25, pp. 3–6). Some of the documents found at Dilbar's home belonged to an individual the government referred to as "Subject A." (*Id.*, p. 5). The documents showed that Subject A had traveled to Afghanistan between January and March of 2025 and sent money back to Afghanistan in April 2025. (*Id.*). These included identification documents, travel documents, and an image of around $20,000 in cash taken at Subject A's

residence. (*Id.*, p. 5). Moreover, the numbers and letters on the handwritten note with Dilbar's fingerprint, found at a crime scene in Afghanistan, were consistent with Military Grid Reference System coordinates. (*Id.*, p. 19).

In considering the parties' arguments, the district court noted that the magistrate judge had not been advised about the 2011 arrest in Afghanistan or the connection to a Foreign Terrorist Organization, as it was newly-discovered evidence in the sense that it was previously classified, and had since been declassified. (5/29/25, pp. 24–29). That the magistrate judge relied heavily upon the lack of a criminal history was a "changed circumstance" that the district court found "very significant in this case." (*Id.*, p. 26). The district court concluded that the government had shown sufficient proof by a preponderance of the evidence that Dilbar presented a risk of flight, and that there were no conditions, or set of conditions, "that would guarantee the return of the defendant to court[.]" (*Id.*, p. 30).

### D. Dilbar Moves the District Court to Stay Its Detention Order, Which Is Denied.

On May 31, 2025, Dilbar moved for a stay of the district court's order, which the government opposed. (W.D.N.Y. Docket No. 6:25-mr-6065, Dkt. 9 and 11). On June 3, 2025, the district court denied the motion for a stay.

Dilbar filed the instant appeal on June 4, 2025.

12

# ARGUMENT

## A.    Standard of Review

A stay is "an exercise of judicial discretion and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotation marks and alterations omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the Court's] discretion." *Id.* at 433–34.

This Court evaluates applications to stay district court orders or other proceedings pending appeal using the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *United States v. Grote*, 961 F.3d 105, 122–23 (2d Cir. 2020) (quoting *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007)).

"The first two factors of the traditional standard are the most critical." *Nken*, 556 U.S. at 434. And where "the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

13

## B.   Governing Law

In reviewing a bail conditions challenge, this Court applies a "deferential review" of the district court's order and reverses only for clear error. *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019) (quoting *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007)). This standard applies not only to the district court's factual findings but also to its overall assessment, based on those facts, as to the risk of flight or danger presented by a defendant's release. *United States v. Mattis*, 963 F.3d 285, 291 (2d Cir. 2020) (quoting *United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004)).

This Court defers to the district court on such matters because of the district court's "unique insights into the defendant as an individual and into his personal, professional, and financial circumstances," *Abuhamra*, 389 F.3d at 317, and because such determinations are "essentially factual and require little, if any, legal interpretation," *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986). *See also Mattis*, 963 F.3d at 293 ("It is not proper, therefore, to inquire as to whether or not we may have decided the bail motion differently were we deciding it in the first instance, as our review is limited to whether the district court committed error in reaching its determination.").

The district court utilizes certain statutory factors in determining whether "there are conditions of release that will reasonably assure the appearance of the

person as required and the safety of any other person and the community." 18 U.S.C. § 3142(g). These factors include: (1) the nature and circumstances of the offense, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g)(4).

A district court's ultimate finding as to whether there are "conditions or a combination of conditions which reasonably will assure the appearance of the defendant at trial is a mixed question of law and fact," which the Court reviews for clear error unless "the [district] court has made an error of law." *United States v. Donziger*, 853 F. App'x 687, 688–89 (2d Cir. 2021) (Summary Order) (quoting *United States v. Shakur*, 817 F.2d 189, 196–97 (2d Cir. 1987)).

### C. Discussion

#### 1. Dilbar has not made a "strong showing" that he is likely to succeed on the merits of his detention appeal.

Dilbar's argument regarding his likelihood of success relies primarily on dismissing the district court's credibility assessments and secondarily on a claim that the district court applied the incorrect legal standard by parsing the district court's language. (Dilbar Motion, pp. 10–18). Neither is so persuasive that it represents a "strong showing" that he is likely to succeed on the merits such that this Court should grant the request for a stay. *Grote*, 961 F.3d at 122–23.

At the outset, this Court pays "special deference" to factual determinations going to credibility. *Berchansky*, 719 F.3d at 153 (internal quotation marks omitted). Here, the district court credited the information proffered by the government. In its oral decision, the district court explained it had reviewed the filings, the transcript before the magistrate judge, and the information provided on the day of the hearing. (Exhibit 4, p. 24). With respect to the last piece, a district court conducts a *de novo* review of any factual findings in a release order and is free to make new factual findings. *United States v. Dominguez*, 509 F. App'x 28, 30 (2d Cir. 2013) (Summary Order) ("On a Section 3145(a) review, the district court was free to review the magistrate judge's factual findings *de novo*, and make new factual findings.").

The district court found that the weight of the evidence appeared to be "relatively strong," and that it was "very significant" that Dilbar appeared to have connection to Foreign Terrorist Organizations and some prior criminal history. (Exhibit 4, p. 26). Specifically, the district court cited information provided by the Terrorist Explosive Device Analytical Center, evidence of Dilbar's fingerprint on a handwritten note with coordinates that could have been for a proposed terrorist attack, his arrest in Afghanistan for impersonating an Afghan national police criminal investigator, and suspicious phone calls Dilbar made to another Afghan national when he was detained, before he even

contacted his family. (Exhibit 4, pp. 29, 32). The district court concluded that Dilbar did present a risk of flight (*id.*, p. 27), which this Court will not disturb unless the record leaves it with "a definite and firm conviction that a mistake has been committed," *Berrios-Berrios*, 791 F.2d at 251 (internal quotation omitted).

Dilbar does not address the high standard of review he faces in demonstrating that the district court committed clear error. This Court will only find clear error "where the record as a whole leaves us with a definite and firm conviction that a mistake has been committed." *United States v. Esteras*, 102 F.4th 98, 104 (2d Cir. 2024) (internal quotation omitted). Put another way, the district court's judgment is clearly erroneous when the decision strikes the Court as wrong "with the force of a five-week-old, unrefrigerated dead fish." *United States v. Phibbs,* 999 F.2d 1053, 1075 (6th Cir. 1993). And in conducting clear error review, this Court "must review the *entire* evidence." *United States v. Rainford*, 110 F.4th 455, 477 (2d Cir. 2024) (internal quotation omitted) (emphasis added). That evidence, summarized *supra*, weighs heavily against a finding of clear error and thus Dilbar has failed to demonstrate a strong likelihood of success on the merits.

For his part, Dilbar expends much ink accusing the government of utilizing what he repeatedly calls "innuendo" (Dilbar Motion, pp. 9–14), but the

government proceeded as permitted by statute—via proffer. *See* 18 U.S.C. § 3142(f); *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995) ("The rules of evidence do not apply in a detention hearing .... Further, the government may proceed by proffer.") (citation omitted). The district court's level of scrutiny of the government's proffer "must lie within the discretion of the presiding judicial officer, informed by an awareness of the high stakes involved[.]" *United States v. Martir*, 782 F.2d 1141, 1145–47 (2d Cir. 1986). To the extent Dilbar attacks the reliability of the government's information, the declassification process and investigation are ongoing and the government is prepared to present additional information to the district court specifically regarding the defendant's connections to the Haqqani Network and access to financial resources in the event of a remand.

Second, Dilbar has failed to demonstrate that the district court applied an erroneous standard. (Dilbar Motion, pp. 16–18). Dilbar's argument hinges entirely on the district court's statement that the court found there were "no conditions, or set of conditions, that would *guarantee* the return of Dilbar to court[.]" (Exhibit 4, p. 30) (emphasis added). By so stating, Dilbar argues that the district court used an "unrealistically high legal standard." (Dilbar Motion, p. 16). But this Court does not require "robotic incantations by district court judges in order to hold that the obligation to consider statutory factors has been

18

satisfied" in detention proceedings. *Mattis*, 963 F.3d at 292. And here, immediately after finding that Dilbar posed a risk of flight, the district court noted that the "question then becomes whether or not there are conditions, or a set of conditions, that would *assure* his returning to court." (Exhibit 4, p. 27) (emphasis added). The district court repeated this language, "no condition or combination of conditions would *reasonably assure* the appearance of Defendant," in its order denying Dilbar's motion for a stay. (W.D.N.Y. Docket No. 6:25-mr-6065, Dkt. 12, p. 2).

To satisfy the "success on the merits" factor, Dilbar must show that his chance of success on the merits is more than a "mere possibility." *Nken*, 556 U.S. at 434. Given the district court's citation of the correct standard at multiple points below, Dilbar has not made a "strong showing" of success on the merits, *Grote*, 961 F.3d at 122–23, and the Court should deny the request for a stay.

### 2. Dilbar will not be irreparably injured absent a stay.

Dilbar asserts that denying a stay will result in him losing his employment and conclusively states, without elaboration, that it will impede his defense. (Dilbar Motion, p. 18). Dilbar's claims are vague and speculative, and do not satisfy his burden of showing he would be irreparably injured.

Even if Dilbar had met his burden of demonstrating that he would be irreparably injured, a stay "is not a matter of right, even if irreparable injury

might otherwise result to the appellant[.]" *Nken*, 556 U.S. at 437 (emphasis added). Accordingly, given that all other factors weigh against a stay, this Court should deny the motion.

### 3. The issuance of a stay would substantially injure the government and is against the public interest.

The third and fourth factors, evaluating both the injury to the opposing party and the public interest, "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Dilbar argues there is no harm to the government or the public interest because he was compliant with his release conditions during the two-week period leading up to the detention order. (Dilbar Motion, p. 21). This ignores the gravity of the offense as well as the discrepancies that the government noted in Dilbar's compliance, including his failure to fully disclose his financial circumstances to pretrial services. (W.D.N.Y. Docket No. 6:25-mr-6065, Dkt. 5, p. 9).

But as both the magistrate judge and district court observed, there is a strong national interest in the government's ability to prosecute this case, which will be undermined if Dilbar flees. Dilbar was able to evade the United States' significant security measures built into the visa process and ultimately gained unlawful entry into the country. The government submits that it would thus injure the government and go against the public interest to stay the district court's detention order.

20

## CONCLUSION

Based on the foregoing, this Court should deny the motion for a stay pending appeal.

DATED:  June 16, 2025, Buffalo, New York

MICHAEL DIGIACOMO
United States Attorney
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202

By:  _____
KATHERINE A. GREGORY
Assistant United States Attorney
*Of Counsel*

# Exhibit 1

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Western District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| DILBAR GUL DILBAR | ) | |
| a/k/a DILBAR GUL TAJ ALI KHAN | ) | 25-MJ-4055 |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   January 2021 through April 4, 2024   in the county of   Monroe   in the

Western   District of   NY, and elsewhere   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 1546(a) | Visa Fraud |

This criminal complaint is based on these facts:

See the attached Affidavit of FBI SA Timothy J. Klapec, with is incorporated herein by reference

☑ Continued on the attached sheet.

*Timothy J Klapec*
*Complainant's signature*

FBI SA Timothy J. Klapec
*Printed name and title*

Submitted electronically by email in .pdf format. Oath administered, and contents and signature attested to me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3).

Date:   April 29, 2025

*Colleen D. Holland*
*Judge's signature*

City and state:     Rochester, NY

Hon. Colleen D. Holland
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

STATE OF NEW YORK  )
COUNTY OF MONROE  )        SS:
CITY OF ROCHESTER  )

I, Timothy J. Klapec, being duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am employed as a Special Agent with the Federal Bureau of Investigation

(FBI) and have been so employed for approximately twenty years.  I am currently assigned to

the Joint Terrorism Task Force (JTTF), Buffalo Division, in Rochester, New York.  At the

JTTF, I work with a team of federal, state, and local law enforcement agents and officers on

investigations relating to domestic and international terrorism, weapons of mass destruction,

and individuals posing a risk of engaging in acts of targeted violence.  As a result of my

training and experience, I am familiar with tactics, methods, and techniques used by terrorist

organizations and their members, by individuals seeking to join or engage in acts on behalf of

terrorist organizations, and by individuals acting on their own to plan and execute acts of

violence in the community.  I have also conferred with other federal agents who have expertise

and experience in visa fraud investigations.  Where the contents of documents and the actions,

statements and conversations of others are reported herein, they are reported in substance and

in part, unless noted otherwise.

2.      I am an investigative or law enforcement officer of the United States within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United

States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3.      I make this affidavit in support of an application for a criminal complaint charging DILBAR GUL DILBAR with violating Title 18, United States Code, Section 1546(a) (Fraud and Misuse of Visas, Permits, and Other Documents) (hereinafter the "TARGET OFFENSE").

4.      The facts contained in this affidavit are based upon my personal involvement in this investigation and information provided to me by other law enforcement agents and private citizens.  Because this affidavit is submitted for the limited purpose of obtaining a criminal complaint, I have not included each and every fact known to me concerning this investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause to believe DILBAR has committed the TARGET OFFENSE.

## PROBABLE CAUSE

5.      DILBAR GUL DILBAR, also known as DILBAR GUL TAJ ALI KHAN (hereinafter "DILBAR"), is a citizen of Afghanistan.  The identification documents issued by Afghanistan, including DILBAR's original Afghan passport, are under the name Dilbar Gul Taj Ali Khan.  However, beginning in or around 2020, DILBAR began using the name Dilbar Gul Dilbar.  The name Dilbar Gul Dilbar is listed on his national ID card and his second Afghan passport.  DILBAR also used the name Dilbar Gul Dilbar in the United States to obtain a New York State Driver's License.

6.      As set forth in greater detail herein, in 2016 and 2021, DILBAR submitted two separate applications to the U.S. Department of State (DOS) for a Special Immigrant Visa (SIV).  DILBAR's SIV applications included a counterfeit U.S. Embassy Kabul Chief of Mission (COM) approval, a fraudulent letter of employment, and a fraudulent Letter of Recommendation.  In the applications, DILBAR falsely attested, under penalty of perjury, that these were authentic documents.

7.      On or about March 20, 2024, DILBAR's fraudulent SIV application was approved and, on or about April 4, 2024, DILBAR was granted admission to the United States.  He currently resides in the Western District of New York.

8.      On the same day that DILBAR was granted admission to the United States, he applied for Legal Permanent Resident ("LPR") card (commonly referred to as a "green card").  DILBAR's green card was issued on or about July 22, 2024.

*Background Regarding Special Immigrant Visas*

9.      Federal law authorizes a limited supply of SIVs each year for Afghan nationals. For example, Section 602(b) of the Afghan Allies Protection Act of 2009, as amended, is a special immigrant visa program, which authorizes the issuance of an SIV to a citizen or national of Afghanistan who, in addition to meeting other requirements, was or is employed in Afghanistan:

- By or on behalf of the U.S. government; or

- By the International Security Assistance Force (ISAF) (or any successor name for the ISAF) while:

- Traveling off-base with U.S. military personnel stationed at the ISAF (or any successor name for the ISAF), to serve as an interpreter or translator for such U.S. military personnel; or

- To perform activities for the U.S. military personnel stationed at the ISAF (or any successor name for the ISAF); and

- Was employed on or after October 7, 2001, and before the date established by the most recent program extension, for a period of not less than 1 year;

- Provided faithful and valuable service to the U.S. government, as documented in a positive recommendation or evaluation by the petitioner's employer;

- Has experienced or is experiencing an ongoing serious threat as a consequence of the petitioner's employment by the U.S. government;

- Has cleared a background check and appropriate screening as determined by the Secretary of Homeland Security; and

- Is otherwise eligible to receive an immigrant visa and is otherwise admissible to the United States for permanent residence.

10.    As part of an Afghan SIV application, each applicant must complete a United States Citizenship and Immigrations Services (USCIS) Form I-360.  At the conclusion of the form, each applicant must sign the following attestation under penalty of perjury:

**Petitioner's Declaration and Certification**

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this petition, in supporting documents, and in my USCIS records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

  1) I provided or authorized all of the information contained in, and submitted with, my petition;

  2) I reviewed and understood all of the information in, and submitted with, my petition; and

  3) All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that all of the information in my petition and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my petition, and that all of this information is complete, true, and correct.

4

11.    An application for the Afghan SIV must include a supporting Letter of Recommendation (LOR) from a person associated with the U.S. Government or ISAF who has personal knowledge of the applicant's qualifying employment.

12.    For an SIV applicant who was employed by or on behalf of the U.S. Government, the LOR must be from a direct, senior supervisor who knew the applicant personally. If the supervisor has left Afghanistan or is no longer employed by the employer, the author of the LOR may also be the person currently occupying that position or a more senior person. In all cases, the author of the LOR must be connected with the SIV applicant's qualifying employment. The supervisory period should overlap with the applicant's period of employment.

*DILBAR's 2016 SIV Application*

13.    In or around July 2016, DILBAR began the process of applying for an SIV under Section 602(b) of the Afghan Allies Protection Act of 2009.

14.    As part of the application process, on or about July 5, 2016, DILBAR applied to the Department of State (DOS) for U.S. Embassy Kabul Chief of Mission (COM) approval of an Afghan SIV.

15.    On or about August 10, 2017, DOS denied DILBAR's application for a COM approval letter. DOS sent DILBAR the following COM Denial letter, dated August 10, 2017:



*Embassy of the United States of America*
*Kabul, Afghanistan*

10-Aug-2017

**Denial of Chief of Mission Approval for Afghanistan Special Immigrant Visa Status**

Case Number: NVCSIV2016187015

Dear DILBAR GUL TAJ ALI KHAN

We regret to advise you that your application for Chief of Mission (COM) approval to submit a petition for the SQ-Special Immigrant Visa (SIV) program has been denied for the following reason(s):

☑ Lack sufficient documents to make a determination

You did not provide a valid letter of recommendation, which is required for the SIV program. We were unable to verify the authenticity of the recommendation letter as the author did not respond to our requests to confirm the authenticity of the document. If you wish to appeal this decision, you must submit a new letter of recommendation

If you believe this denial was made in error, you may make one appeal of the decision. Your appeal must be submitted to AfghanSIVApplication@state.gov within 120 days of the date you received this letter. The appeal should include any new information (including documentation) that you believe will overcome the reasons for the denial. Please include a copy of this letter with your appeal.

Chief of Mission
U.S. Embassy Kabul

16.     Notwithstanding the fact that he had been denied a COM approval letter, DILBAR continued to pursue an SIV. On or about November 13, 2017, DILBAR filed USCIS Form I-360 (which was required as part of the SIV application), signed the required attestation under penalty of perjury, and included the below COM approval letter, dated August 10, 2017 (the exact same date on the COM denial letter that was sent to DILBAR):

6



*Embassy of the United States of America*
*Kabul, Afghanistan*

10-Aug-2017

**Chief of Mission Approval for Afghanistan Special Immigrant Visa Status**

Case Number: NVCSIV2016187015
Dear: DILBAR GUL TAJ ALI KHAN

The United States Embassy in Kabul, Afghanistan has reviewed the qualifications of the principal applicant named above and has established that:

- ☑ The individual is a national of Afghanistan;
- ☑ The individual has been employed by, or on behalf of the United States Government or by the International Security Assistance Force (or any successor name for such Force) in Afghanistan, on or after October 7, 2001, for a period of not less than one year; or, if submitting an application for COM Approval after September 30, 2015, for a period of not less than two years;
- ☑ The individual has provided faithful and valuable service to the United States Government or the International Security Assistance Force (or any successor name for such Force);
- ☑ The individual named above has experienced or is experiencing an ongoing serious threat as a consequence of the employment by or on behalf of the United States Government or by the International Security Assistance Force (or any successor name for such Force).

The principal applicant named above is hereby authorized to submit a petition for special immigrant status under Section 602(b) of the "Afghan Allies Protection Act of 2009."

Chief of Mission
U.S. Embassy Kabul

17.    DILBAR used email address dilberfahim@yahoo.com to email the Form I-360, which contained the counterfeit DOS COM Approval letter, as shown below:

7



18.    The purported COM approval letter is counterfeit.  As such, on or about January 23, 2018, USCIS denied DILBAR's SIV application.

***DILBAR's 2021 SIV Application***

19.    In or around 2021, DILBAR re-applied for a SIV.

20.    As part of this second application, on or about October 16, 2021, DILBAR filed another USCIS I-360 and signed the required attestation under penalty of perjury.  In the petition, DILBAR included a letter of employment dated January 5, 2021, from a U.S.-based company.  A redacted copy of the letter of employment is shown below:

8



21.    The DOS has investigated the U.S.-based company that issued DILBAR's purported employment verification letter, and determined that the company was engaged in a large-scale scheme to provide fraudulent documents, such as employment verification letters, in exchange for a fee.  All SIV employment verification letters authored by this entity are fraudulent.

22.     On or about January 11, 2021, DILBAR also submitted a Letter of Recommendation to the DOS as part of his second SIV Application. The Letter of Recommendation was dated January 5, 2021, and was signed by "Ray James" with the name MANUEL RAY JAMES in the signature block. In the Letter of Recommendation, JAMES claimed to be a Project Engineer for a "US Army Corps of Engineering [sic]" funded project and asserted that he had supervised DILBAR since on or about January 1, 2017.

23.     A separate DOS investigation has determined that MANUEL RAY JAMES, using email address robert1king@afghan.swa.army.mil, is involved in an "advance-fee" scam, through which he sells fraudulent immigration documents, like DILBAR's Letter of Recommendation, to unqualified aliens.

24.     On or about December 9, 2024, law enforcement executed a federal search warrant on DILBAR's Google mail account. That search revealed that, on or about April 26, 2021, an individual using the name MANUEL JAMES and email address robertking2211@outlook.com forwarded an email to DILBAR. The forwarded email was from the DOS National Visa Center to email addresses robert1king@afghan.swa.army.mil and robertking2211@outlook.com. The email requested verification of DILBAR's Letter of Recommendation. The bottom of the email contained an attachment entitled "Dilbar Gul REC". On or about July 6, 2021, DILBAR responded to robertking2211@outlook.com stating "Got it, thanks!"

*Approval of DILBAR'S SIV and LPR Applications*

25.     On or about March 20, 2024, DILBAR's fraudulent SIV application was approved. On or about April 4, 2024, DILBAR applied for and was granted admission to the

United States using his SIV. On the same date, on or about April 4, 2024, DILBAR applied for Legal Permanent Resident (LPR) card.

26.     On or about July 22, 2024, DILBAR's received a ten-year LPR card (i.e., a "green card"), which was shipped to his residence in the Western District of New York.

27.     The United States government relied upon the false documents DILBAR submitted in support of his SIV application when it reviewed and approved DILBAR's LPR application and issued him a green card.

28.     As outlined above, on multiple occasions DILBAR submitted fraudulent documents to the United States Government and falsely certified, under penalty of perjury, that those documents were authentic, all in an effort to obtain his SIV and green card. As a result, he fraudulently obtained an SIV, admission to the United States, and a green card.

## CONCLUSION

29.    Based on the foregoing, there is probable cause to believe DILBAR knowingly

violated Title 18, United States Code, Section 1546(a).


_Timothy J. Klapec_
Timothy J. Klapec
Special Agent
Federal Bureau of Investigation


Affidavit submitted electronically by email
in .pdf format. Oath administered, and
contents and signature attested to me as
true and accurate telephonically pursuant
to Fed. R. Crim. P. 4.1 and 41(d)(3) on this
_29th_ day of April, 2025.

_Colleen D. Holland_
HON. COLLEEN D. HOLLAND
United States Magistrate Judge

# Exhibit 2

1

```
10:52:08   1
09:06:15
           2                  UNITED STATES DISTRICT COURT
                             WESTERN DISTRICT OF NEW YORK
           3

           4
               - - - - - - - - - - - - - - X
           5   UNITED STATES OF AMERICA    )        25MJ4055
                                Plaintiff  )
           6   vs.
                                                 Rochester, New York
           7   DILBAR GUL DILBAR           )      May 9, 2025
                                Defendant.         9:30 a.m.
           8   - - - - - - - - - - - - - - X
               DETENTION HEARING
           9   Transcribed from an Electronic Recording Device

          10               TRANSCRIPT OF PROCEEDINGS
                      BEFORE THE HONORABLE COLLEEN D. HOLLAND
          11            UNITED STATES MAGISTRATE JUDGE

          12

          13   FOR PLAINTIFF:   MEGHAN K. MCGUIRE, ESQ.
                                Assistant United States Attorneys
          14                    100 State Street
                                Rochester, New York 14614
          15

          16
               FOR DEFENDANT:   ANNE M. BURGER, ESQ.
          17                    Assistant Federal Public Defender
                                28 East Main Street, Suite 400
          18                    Rochester, New York 14614

          19

          20                    K. NENNI, USPO

          21

          22                    Tofan Dawarzai, Pashto Interpreter

          23

          24   COURT REPORTER: Karen J. Clark, Official Court Reporter
                                Karenclark1013@AOL.com
          25                    100 State Street, 6th Floor
                                Rochester, New York 14614
```

2

```
 1                  USA V. DILBAR GUL DILBAR

 2                   P R O C E E D I N G

 3            *              *              *

 4

 5            THE CLERK:  We are on the record in the

 6   matter of the United States versus Dilbar Gul Dilbar

 7   25MJ4055.  The matter is on for a detention hearing.

 8            MAGISTRATE JUDGE HOLLAND:  Good morning, Mr.

 9   Fowler.  Could you please swear in our interpreter.

10            (Interpreter was administered the oath by

11   the Courtroom Deputy.)

12            MAGISTRATE JUDGE HOLLAND:  Good morning.  We

13   have Ms. McGuire here from the United States Attorney's

14   Office; Ms. Burger is here from the Federal Public

15   Defender's with her client Mr. Dilbar.  We also have

16   Officer Nenni here from the United States Probation

17   Office.  And Mr. Dilbar is present in the courtroom.

18   We're on this morning for a detention hearing.  I

19   received yesterday, well, it was yesterday afternoon,

20   the Pretrial Services Report from Officer Nenni.  Ms.

21   Burger, did you also receive a copy?

22            MS. BURGER:  Yes, I did.

23            MAGISTRATE JUDGE HOLLAND:  Ms. McGuire?

24            MR. ELDRIDGE:  Yes, I did.

25            MAGISTRATE JUDGE HOLLAND:  Is there anything
```

```
 1                  USA V. DILBAR GUL DILBAR
 2   you need to bring to my attention before we get started?
 3                  MS. BURGER:  No.
 4                  MAGISTRATE JUDGE HOLLAND:  Ms. McGuire?
 5                  MR. ELDRIDGE:  No.  Thank you, your Honor.
 6                  MAGISTRATE JUDGE HOLLAND:  All right.  It's
 7   the government's motion, so, Ms. McGuire, whenever
 8   you're ready, you can start.
 9                  MS. MCGUIRE:  Thank you, your Honor.  As
10   you're aware, the government has moved to detain the
11   defendant under 18 U.S.C. Section 3142(f)(2)(A) on the
12   grounds that there is a serious risk of flight in this
13   case.  I would like to start by giving a little more
14   detail about the charged offense.  The Afghan Special
15   Immigrant VISA program is an extremely important effort
16   to offer admission to the United States to Afghan
17   nationals who supported the United States and its allies
18   during its war in Afghanistan by serving in a qualified
19   employment position for a requisite amount of time.
20   From what we can tell, the defendant did work in
21   Afghanistan as a translator for some amount of time
22   between 2009 and 2011.  It does not appear to have been
23   continuous employment, and he was ultimately terminated
24   from his position because he stopped showing up.  So it
25   is unclear at this point whether or not this defendant
```

4

```
 1                    USA V. DILBAR GUL DILBAR
 2   ever served the requisite amount of time to be qualified
 3   for this particular VISA.  But we do know that five
 4   years after he was terminated from his position, in
 5   2016, the defendant submitted the first of his two VISA
 6   applications.  The first step in obtaining that VISA is
 7   to obtain approval from the Chief of Mission in the U.S.
 8   Embassy Kabul.  That is what is referred to as a COM
 9   approval letter.  The defendant's COM approval letter
10   was denied because he failed to provide sufficient
11   documentation to verify his employment.  At this point
12   in the process, an applicant has two options.  They can
13   either obtain additional documentation to submit and
14   seek approval or they can obtain a waiver of that
15   requirement.  A waiver is available if someone is unable
16   to obtain the proper employment documentation because of
17   circumstances that made it difficult or impossible to do
18   so.  The defendant did neither of these things.
19   Instead, he created a fraudulent COM approval letter and
20   he proceeded to file a VISA application with that
21   fraudulent approval letter.  That letter was identified
22   as a forgery.  And in 2018, this first VISA application
23   was denied.  Over the next three years, what we've been
24   able to find in the defendant's e-mails, was that he
25   began reaching out to various companies with operations
```

```
 1                    USA V. DILBAR GUL DILBAR
 2    in Afghanistan.  He never worked for any of these
 3    companies.  But he would write to them, claim he had
 4    worked for them, and ask for an employment letter.  He
 5    used different names, different variations of his names,
 6    different dates of birth, hoping that one of these
 7    companies had bad enough recordkeeping that they would
 8    not realize that he never worked for them.  Each of
 9    these companies denied his request because he never
10    worked for them.
11            When these efforts failed, the defendant
12    went to the next step and purchased fraudulent
13    employment letters.  The first fraudulent employment
14    letter was from a company that law enforcement now knows
15    is engaged in large scale fraud selling these letters to
16    VISA applicants for a fee.  In fact, according to the
17    Department of State's records, over 100 letters of
18    employment that have been submitted by this particular
19    company have been identified as fraudulent.  Not a
20    single one has been verified as legitimate.
21            MAGISTRATE JUDGE HOLLAND:  Ms. McGuire, do
22    you know what kind of a fee they charged for these
23    fraudulent letters?
24            MS. MCGUIRE:  That company in particular, I
25    do not.  The next letter I'm going to discuss from Ray
```

                    USA V. DILBAR GUL DILBAR

1
2    James, we believe he charged another person around
3    $2,000.
4                    MAGISTRATE JUDGE HOLLAND:  Okay.  Thank you.
5                    MS. MCGUIRE:  And that is the second
6    fraudulent employment letter was with this individual
7    named Ray James.  He was posing as a supervisor for a
8    United States military contractor in Afghanistan.  In
9    exchange for a fee, he would issue VISA applicants
10   fraudulent employment letters and then verify the
11   employment when the Department of State called to check
12   their references.  We know that he has done this in
13   other situations.  And the defendant's e-mail shows him
14   communicating with this Ray James person about the
15   letter of recommendation and the Department of State's
16   ensuing efforts to verify its authenticity.
17                    The third fraudulent letter of
18   recommendation that the defendant obtained and submitted
19   for COM approval was from an individual named Arlene
20   Serrett.  This letter claimed that Arlene Serrett was an
21   Afghan employer who lived here in Rochester, New York at
22   the exact same house where the defendant now resides.
23   Armed with these fraudulent employment letters in 2021,
24   the defendant made his second attempt at obtaining a COM
25   approval letter.  And, unfortunately, at this time, the

                    USA V. DILBAR GUL DILBAR

1  
2   frauds were not detected and he received a COM approval
3   letter.  This allowed him to proceed and file a VISA
4   application.  And, importantly, the VISA application,
5   the form 260, has a question on there that asks the
6   applicant under penalty of perjury whether they have
7   ever previously been denied a VISA.  The defendant lied
8   in his application and said "no."  If he had told the
9   truth and admitted that he was previously denied in
10  2016, his 2021 application never would have been
11  granted.  But instead, because of this additional lie,
12  his VISA application was granted.  And as a derivative
13  of his VISA application being granted, again, by fraud,
14  his wife and children were all also granted VISAs.  All
15  of those VISAs are a derivative of the defendant's
16  fraudulently obtained VISA.
17                  After the VISA was granted in April of 2024,
18  the defendant was admitted to the United States and came
19  to reside here in Rochester, New York and obtained his
20  green card.  One of the first things the defendant did
21  when he got here was apply for a New York State license
22  to act as a security guard at public events.  That is
23  actually what tipped law enforcement off to his
24  presence.  It was immediately a serious concern because
25  someone who was not supposed to be here in the first

```
 1                    USA V. DILBAR GUL DILBAR
 2    place was seeking enhanced access to public spaces and
 3    public events.  Since arriving, the defendant has
 4    continued to be in contact with Ray James, the
 5    individual who falsified his second employment letter.
 6    They've exchanged identification documents and it's
 7    appeared that the defendant has made an additional
 8    payment to this Ray James person since arriving in the
 9    United States.  We don't know what purpose.  The
10    defendant's own records also show that since arriving in
11    the United States, he has been in contact with a second
12    individual who is currently being investigated for
13    large-scale fraud related to the Afghan Special
14    Immigrant VISA program.
15              And, finally, when law enforcement searched
16    the defendant's residence, they found VISAs and identity
17    documents belonging to other Afghan nationals who do not
18    live in that residence, one of which does not even live
19    in this state.  There appear to be no legitimate reasons
20    for the defendant to have these other people's
21    immigration and identity records in his residence.  So
22    there is some real concern here that even now that he
23    and his family are in the United States, the defendant
24    is continuing to engage in fraud that puts our national
25    security at risk.
```

9

```
 1                    USA V. DILBAR GUL DILBAR
 2              Turning to the section (g) factors, the
 3    first, the nature and circumstances of the crime weigh
 4    heavily in favor of detention.  VISA fraud is extremely
 5    serious.  As I just said, it undermines our national
 6    security.  And it also undermines the process for other
 7    hopeful VISA applicants who want and deserve to be here
 8    in the United States to do it the right way.  The (g)
 9    factors, weight of the evidence against the defendant
10    also weighs heavily in favor of detention.  As I already
11    explained, the government already has ample proof of
12    five instances in which the defendant engaged in fraud
13    to obtain his VISA and ultimately his green card.  Proof
14    of just one of those frauds would be sufficient to
15    sustain a conviction in this case, but I'm confident
16    that we are going to prove each of them beyond a
17    reasonable doubt.
18              The third section (g) factor is the history
19    and characteristics of the defendant and in particular
20    his ties to the Western District of New York.  He has no
21    ties to the Western District of New York.  He has lived
22    here for only a year.  And outside of his immediate
23    family members, his wife and children, which I'll
24    discuss in a second, none of his other family members
25    live here.  I am sure that the defendant has developed
```

1               USA V. DILBAR GUL DILBAR
2    some community connections over the past year.
3    Rochester is a very generous and welcoming community and
4    there are people and organizations in Rochester that
5    commit themselves to doing wonderful work, helping
6    families from Afghanistan who legitimately obtained
7    these VISAs and welcoming them into our community.  This
8    defendant has taken advantage of those people and their
9    kindness.  And I can tell you that just from this bail
10   report, because he identified an individual in the
11   Rochester community to verify some of his statements
12   like his past employment.  That individual claimed that
13   he believed that the defendant worked as a pharmacist in
14   Afghanistan.  During the VISA application process, he,
15   the defendant, had to give his employment history on
16   multiple occasions.  Not once did he ever mention being
17   a pharmacist.  It's a lie that he told someone here in
18   Rochester who is only trying to help him.
19           But, the most important element of this
20   analysis I think is the defendant's wife and children,
21   all of whom are here in the United States.  As I
22   mentioned earlier, all of their VISAs were obtained as a
23   result of the defendant's VISA.  They are all fruit of
24   that same fraudulent tree.  So the defendant has put his
25   own family in a horrible position of bringing them to

```
 1                    USA V. DILBAR GUL DILBAR
 2      the United States under false pretenses with no
 3      guarantee that they can actually stay here.  All of
 4      their statuses are at risk.
 5               Let's give the defendant the benefit of the
 6      doubt for a minute.  Let's say he did all of this only
 7      because he was desperate to get his family out of
 8      Afghanistan.  If he was desperate enough then to lie to
 9      the United States Government over and over again just to
10      get out of Afghanistan.  Then he is desperate enough now
11      to ignore court orders and flee the jurisdiction to
12      avoid them being sent back to Afghanistan.  If he was
13      willing to do anything then to get out of Afghanistan,
14      he is willing to do anything now to stay out of
15      Afghanistan.  It's the same motivation, it's the same
16      analysis.  The fact that the defendant's immediate
17      family is here isn't a reason to release him, it's the
18      exact reason he needs to be detained.  And finally, with
19      respect --
20               MAGISTRATE JUDGE HOLLAND:  Ms. McGuire, and
21      I don't mean to interrupt you, but with regard to that,
22      and I understand the argument that you're making, but,
23      and, again, because the real question here is the
24      potential for flight is the suggestion that he would
25      flee with his wife and children, because, I mean, it's a
```

```
 1                    USA V. DILBAR GUL DILBAR
 2   seven-year-old, a six-year-old, a five-year-old, a
 3   one-year-old and a one-month-old, it seems like a
 4   logistically difficult proposition to me.
 5             MS. MCGUIRE:  I think it is logistically
 6   difficult to get them over here in the first place and
 7   he managed to do that.  And if it's a question of
 8   whether they are going to be able to stay in the United
 9   States at all or get sent back, yeah, I do think there
10   is a chance that they would try to disappear somewhere
11   within the country to avoid any issues with their
12   statuses or being sent back to Afghanistan.
13             MAGISTRATE JUDGE HOLLAND:  All right.
14             MS. MCGUIRE:  And just to conclude on the
15   fourth factor, the nature and seriousness of the danger
16   to the community.  All I can say with respect to that,
17   is that, again, the VISA program has extensive vetting
18   procedures for a reason.  When people lie to avoid those
19   vetting procedures, they are inherently placing our
20   country at risk.
21             Your Honor, for all of those reasons, the
22   government respectfully requests the defendant be
23   detained pending the resolution of this criminal
24   proceeding.
25             MAGISTRATE JUDGE HOLLAND:  Ms. McGuire, let
```

```
 1                 USA V. DILBAR GUL DILBAR
 2   me ask you a clarifying question, I guess, about that
 3   last factor, which is obviously under 3142.  The
 4   question is first -- well, as a threshold matter, is
 5   there a serious risk of flight to warrant a detention
 6   hearing and potential detention.  But assuming we get
 7   past that, other conditions or combination of conditions
 8   that can protect against either the risk of
 9   nonappearance or the risk to the safety of the community
10   or any individual.  Are you arguing that Mr. Dilbar
11   poses a risk to the safety of the community or any other
12   person?
13             MS. MCGUIRE:  I cannot give you any
14   information on that right now, no.  I'm arguing risk of
15   flight.
16             MAGISTRATE JUDGE HOLLAND:  Okay.  All right.
17        Ms. Burger, do you need any time to speak to your
18   client before you respond or are you ready to proceed?
19             MS. BURGER:  I think we're ready to proceed.
20             MAGISTRATE JUDGE HOLLAND:  All right.
21             MS. BURGER:  At the outset, your Honor, I
22   want to thank you for making the interpreter available.
23   My client does speak some conversational English, I
24   think the issue of legal terms and some of the concepts
25   that we throw around in court, I'm certain that he would
```

```
 1                    USA V. DILBAR GUL DILBAR
 2   not have an understanding of what we were talking about.
 3   So I do appreciate you supplying that.
 4               MAGISTRATE JUDGE HOLLAND:  Of course.
 5               MS. BURGER:  There are certainly bail
 6   conditions that would reasonably assure my client's
 7   return to court.  The government has failed to meet
 8   their showing, and the conditions that I intend to
 9   propose to address any concern would be that my client
10   would report to U.S. Pretrial as directed, he would
11   restrict his travel to Monroe County, not the district,
12   but Monroe County, he would submit to GPS location
13   monitoring, he would permit U.S. Pretrial to monitor his
14   finances.  And this is in particular to address the
15   suggestion made by the government that he is capable of
16   making travel arrangements for himself and his family to
17   sort of flee the area.  He disclosed in a -- in the
18   interview with pretrial that he has access to one credit
19   card and he also has a savings account and checking
20   account, that is where he has access to funds.  And he
21   is prepared to give pretrial full access to all of those
22   accounts so they can monitor what he is spending money
23   on.  And certainly purchasing airline tickets for his
24   entire family would be a red flag.  But he is willing to
25   provide constant access to pretrial of his finances.  He
```

```
 1              USA V. DILBAR GUL DILBAR
 2   is also willing to execute an Irrevocable Waiver of
 3   Extradition.  And this one is a new one to me, your
 4   Honor.  With the assistance of others in my office, we
 5   did some quick PACER searches on other cases in our
 6   district with this same charge to assess have
 7   individuals with these charges ever been released
 8   before, and if so, with what conditions.  And we did
 9   identify that this particular condition execution of an
10   Irrevocable Waiver of Extradition was entered in two
11   matters.  One of them, the Afrah, A-f-r-a-h, case, the
12   case number is 16CR92, that was a case where the
13   government did move to detain, but the Court ordered Mr.
14   Afrah released in conjunction with conditions that
15   included this signing off on one of these Irrevocable
16   Extradition Waivers.
17              There was one other matter, Adebayo,
18   A-d-e-b-a-y-o, case, 15CR95, where, again, at a
19   detention hearing, the Court denied the government's
20   motion and ordered release and also the signing of an
21   Irrevocable Extradition Waiver.  And I don't know that
22   these are all of the cases with the same charge, but we
23   did find about 43 of them.  There were two where that
24   was a condition.  I was able to obtain the waiver that
25   was executed by Mr. Afrah.  I have it.  I can certainly
```

```
 1                    USA V. DILBAR GUL DILBAR
 2    provide it to the Court.  I've marked it as Defendant's
 3    B.
 4                    MAGISTRATE JUDGE HOLLAND:  All right.
 5                    MS. BURGER:  And I did review this with my
 6    client this morning with the assistance of the
 7    interpreter.  As you can see, it's a document that
 8    appears to have been provided to convey this
 9    individual's intention and commitment to return to court
10    and even go one step further that to the extent that
11    they were located somewhere else, including outside of
12    the country, including in a country with no extradition
13    treaty, that this individual agreed to waive any
14    challenge whatsoever to their return.
15                    Now, I want to be clear that my client is
16    not in any way contemplating that he would ever leave
17    the jurisdiction or the country, but in order to ensure
18    the Court's confidence that he would return, he is
19    willing to agree to this type of a condition as part of
20    his pretrial supervision conditions if the Court agrees
21    to release him.
22                    MAGISTRATE JUDGE HOLLAND:  Are you aware,
23    Ms. Burger, of any, I guess, authority or litigation
24    regarding the enforceability of one of these irrevocable
25    waiver's of extradition.
```

1            USA V. DILBAR GUL DILBAR

2            MS. BURGER:  I'm not.  And I have to say

3    that, again, I've never heard of such a thing and

4    finding it took a bit of doing, but I can certainly look

5    into whether they had ever been challenged.  I know in

6    this case, it was actually entered in the case and I

7    don't recall seeing docket entries where the government

8    was objecting, and, you know, suggesting that it

9    couldn't be enforced.

10           MAGISTRATE JUDGE HOLLAND:  All right.

11           MS. BURGER:  Going on.  My client would also

12   agree to a no alcohol condition.  He doesn't drink,

13   never has, but he is willing to commit to continue not

14   to drink.  And he is prepared to agree to all of the

15   other standard conditions.  No applications for or

16   attempts to obtain international travel documents, no

17   controlled substances without a prescription, drug

18   testing and treatment, if indicated.  He has never used

19   drugs in his life.  No weapons.  No criminal activity,

20   reporting of police contact within 72 hours, maintaining

21   employment.

22           In light of the government's proffer, I

23   would also suggest that an additional condition could

24   address who he is communicating with and about what

25   topics, because I know in other instances, pretrial has

```
 1                    USA V. DILBAR GUL DILBAR
 2   been given permission to install, essentially, spy ware
 3   on individual's electronic devices so their electronic
 4   conversations can be monitored.  That is a condition
 5   that I have not had an opportunity to discuss with my
 6   client, but based on his overall response and interest
 7   in complying with any conditions the Court would impose,
 8   I do not expect that is something that he would disagree
 9   with as a condition.  These conditions would be secured
10   by my client's family's life savings.  Approximately
11   $7,000 that is currently in their bank accounts.
12   Certainly tying up his life savings would also make it
13   difficult, if not impossible, frankly, for him to travel
14   with five children and his wife out of our country or
15   out of our area.  These conditions would further be
16   secured by the involvement of David Hough, who has
17   agreed to act in the role of third-party custodian.  I
18   understand that -- I understand the government's
19   arguments, they feel that everyone that my client has
20   befriended in Rochester has fallen prey to him and then
21   been duped by him, I would respectfully disagree.  There
22   are a number of individuals in court today on his behalf
23   and they range in terms of their professions.  I think
24   we have at least one lawyer, we have at least one
25   professional engineer, and other individuals who I do
```

```
 1                    USA V. DILBAR GUL DILBAR
 2   not think would be easily duped.  In any event, I
 3   understand that Mr. Hough, although he is a friend of my
 4   client, is willing to be in the role of third-party
 5   custodian.
 6              Now, with respect to the pretrial report, I
 7   know that Ms. Nenni's office takes the position there
 8   are no conditions that would reasonably assure my
 9   client's return.  And, frankly, in my experience, this
10   is to be expected.  I have seen U.S. Pretrial routinely
11   take the position where the defendant is not a U.S.
12   citizen, that there are no conditions that would assure
13   their return unless the government, of course, has not
14   moved for detention.  And in this particular case, I'm
15   not going to say anything beyond that, other than point
16   out some things with the report that I think the Court
17   should be aware.  First, there is discussion on page two
18   about identification, and there is a version about a
19   comment by Mr. Hough and an international driver's
20   license issued in Afghanistan or Albania.  Now, I don't
21   know for certain that this is what pretrial is getting
22   to.  But I'm familiar with international driver's
23   licenses having years ago considered getting one for a
24   trip to Europe to be able to seamlessly drive, but my
25   understanding is they are not international travel
```

USA V. DILBAR GUL DILBAR

1       documents.  They are simply a more streamlined way to

2       rent cars and drive vehicles in different countries.

3       The risk issue that they cite, which is on page 3, No.

4       5, possession of a passport, history of international

5       travel.  The first part of that possession of a passport

6       sort of relates to this issue of I.D.  And I did check

7       with Ms. McGuire before court because it was my

8       understanding from members of the community who were

9       with my client's family after searches at his house,

10      that his identity documents had been seized during

11      searches at that residence.  And I understand from Ms.

12      McGuire that it is also her understanding that the

13      agent's goal was to seize all of my client's identity

14      documents from his home.  I have no reason to believe

15      that they were not thorough and I have no reason to

16      believe they have left behind a passport.  And so just

17      to address that concern cited by pretrial on page 3, No.

18      5.

19            With respect to the another concern of

20      pretrial, page 3, No. 2, mental health concerns.

21      Pretrial is associating that with a risk of

22      nonappearance.  Well, what my client actually said to

23      pretrial during that interview was that he was fearful

24      and anxious due to the conditions in the jail where he

```
 1                   USA V. DILBAR GUL DILBAR
 2   is residing at the moment and has been since his initial
 3   appearance.  All of his answers to all of the other many
 4   questions relating to mental illness that probation
 5   posed were negative.  He has no history of mental
 6   illness, suicidal ideations, he has never been
 7   committed.  So with respect to all of the other standard
 8   questions that pretrial asks and did ask my client, his
 9   answers were all uniformly "no."  He does not suffer
10   from mental illness and his stress and anxiety is
11   because he is in a jail that makes him fear for his
12   safety.
13             With respect to the reference to a shooting,
14   and that I believe is on page 3, as I read it, and I may
15   not be interpreting it the way pretrial meant it to read
16   it, I read that as if pretrial took the position my
17   client said he was working as an interpreter and was
18   shot as he was working as an interpreter back in 2010.
19   And my client actually said that during the interview
20   that during that time frame when he was working for the
21   U.S. in Afghanistan, he was shot as he left his house
22   early in the morning.  And I just want to clarify for
23   record purposes that that was what he said and perhaps
24   that is what pretrial means with that, but I just want
25   that to be very clear.
```

```
 1                    USA V. DILBAR GUL DILBAR
 2              Regarding travel, my client's only
 3   international travel involved traveling from Afghanistan
 4   to the United States.  He detailed for pretrial every
 5   layover on his way to the U.S. to pretrial.  He said he
 6   went from Afghanistan to Dubai to Kuwait, to Albania, to
 7   Germany and to the U.S.  This travel was planned and
 8   paid for by an NGO.  An NGO who he is now reimbursing.
 9   And I will be expecting to submit an updated Financial
10   Affidavit to the Court because one of his creditors was
11   this entity that he forgot about.  They are referred to
12   on page two as a loan and the outstanding amount is
13   $4700.  You see, it's called --
14              MAGISTRATE JUDGE HOLLAND:  Travel expenses,
15   I see that.
16              MS. BURGER:  Yes, so this non-governmental
17   organization booked all of his travel and his family's
18   travel, paid for it and he is now paying them back at
19   the rate of $35 a month.
20              MAGISTRATE JUDGE HOLLAND:  Does that include
21   he spent about seven months in Albania, correct?
22              MS. BURGER:  That is my next point.  With
23   respect to Albania, he ended up staying in Albania for
24   roughly six to seven months, that was not a residence.
25   Albania, along with some other countries, including
```

```
 1                 USA V. DILBAR GUL DILBAR
 2   Costa Rica, agreed to help the Biden administration with
 3   Afghan refugees and they agreed to temporarily allow
 4   Afghan residents to temporarily stay within their
 5   borders as they awaited processing of their request to
 6   travel to the U.S.  And so his stop in Albania was
 7   lengthier than anyone anticipated because his wife was
 8   very much pregnant and they were there until it was safe
 9   for her to travel.  So before they delivered their
10   one-year-old child until after the birth and so he
11   wasn't living there, he was there under an agreement
12   between the Biden administration and Albania, but he was
13   there a little bit longer because of safety of his wife
14   and in conjunction with the birth of one of their
15   children.
16             MAGISTRATE JUDGE HOLLAND:  And so his wife
17   and his young children were with him for every step of
18   this travel?
19             MS. BURGER:  That is correct, except for the
20   youngest.  The youngest was born here in the United
21   States, and is actually not under any sort of derivative
22   status.
23             MAGISTRATE JUDGE HOLLAND:  So the youngest
24   is a U.S. citizen.
25             MS. BURGER:  Yes.  Now, with respect to the
```

```
 1                    USA V. DILBAR GUL DILBAR
 2   survey -- and in terms of the pretrial report, those
 3   were our only comments.
 4              With respect to the PACER survey that we
 5   did, we did identify 43 individuals, and there may be
 6   more, but, again, time was of the essence, 43 cases
 7   where individuals were also charged with 1546 violations
 8   as my client is within our district.  It's worth noting
 9   that the vast majority of them received sentences of
10   time served.  In five of these individual's cases, the
11   government did not move to detain.  In four others, the
12   government moved to detain, but the Court denied the
13   government's detention motion.  So with respect to
14   these, I believe, 43 individuals, nine of them were
15   released, five of them on consent by the government.  In
16   two of these cases that I've identified, obviously
17   additional, the additional condition was that
18   Irrevocable Extradition Waiver, and I've identified
19   those two individual cases for your Honor.  I have some
20   discovery and I appreciate the government did provide
21   that so quickly, it's not full discovery, but I've done
22   some very preliminary calculations and it also appears
23   that if my client were to be convicted of this charge
24   after a trial, it seems that my client would face a
25   recommended Guidelines range of zero to six months.  Now
```

                    USA V. DILBAR GUL DILBAR

2   there may be other Guidelines specific offense

3   characteristics that the government would say that would

4   apply that I'm not aware of, but based on what I know

5   now, again, it appears that my client would face a

6   recommended range of zero to six months if found guilty

7   after trial, that is in zone A of the Guidelines table.

8                    MAGISTRATE JUDGE HOLLAND:  I think here the

9   government's argument, and I don't want to put words in

10  Ms. McGuire's mouth, is that the consequences that are

11  the most, perhaps, that Mr. Dilbar has the highest

12  incentive to avoid are not necessarily the potential

13  jail time, but the collateral consequences and the

14  inability to remain in the United States with his

15  family.

16                    MS. BURGER:  Right.  And I think this is

17  merely a factor in the analysis.  With respect to that,

18  I understand the government's view is that the status

19  that my client and his family now have was fraudulently

20  obtained and I expect that in the future, based on that,

21  that is the government will be looking to go through

22  immigration court, probably to try and have that status

23  changed or revoked.  Now, I realize that is not

24  something for your Honor to determine, but it's not

25  something that is going to be summarily decided, it's

```
 1                    USA V. DILBAR GUL DILBAR
 2   something that is going to take time.  I expect that
 3   we'll be looking to assist my client in obtaining an
 4   immigration attorney.  Presumably his family, his wife
 5   and children will also be looking for immigration
 6   assistance.  So I think this is not a type of situation
 7   where one morning my client will wake up and find ICE
 8   outside prepared to remove him and his family to another
 9   country.  It is a process.  And indeed within the
10   immigration system, it's possible that the government
11   could raise some issue with respect to, I think, avail
12   immigration.  But that is a different form that will
13   take place over time, and I don't think that is
14   necessarily something that we can guess at right now.
15   But I do understand the government's point and I
16   understand that it's the government's point that the
17   worry and the fear that at one point in the future that
18   status will be taken away is a concern that could relate
19   to flight.
20             MAGISTRATE JUDGE HOLLAND:  Right.
21             MS. BURGER:  And I think that is clear that
22   that certainly could relate to flight.
23             MAGISTRATE JUDGE HOLLAND:  And I don't mean
24   to interrupt you, let me ask Ms. McGuire a question
25   while discussing Mr. Dilbar's status, which is because
```

```
 1                    USA V. DILBAR GUL DILBAR
 2   Mr. Dilbar has a green card, this is not a case where
 3   3142(d) would have any an applicability.  Is that
 4   correct?
 5              MS. MCGUIRE:  I don't know off the top of my
 6   head, your Honor.  But it is different, say, than a 1325
 7   or 1326 case where someone has no documents, it would be
 8   a different process for immigration.
 9              MAGISTRATE JUDGE HOLLAND:  All right.
10              MS. BURGER:  So just more generally with
11   respect to the (g) factors.  As the Court knows, my
12   client is 33 years old.  He lives here in Rochester with
13   his wife and five children.  He has lived in the same
14   house since 2024.  He is connected with many different
15   individuals in communities since he has arrived here.
16   He is connected with two religious communities - a
17   church next door to his home Grace Church, and to the
18   Islamic Center on Westfall Road where he attends
19   services.  He also attends services at Grace Church and
20   there are a number of people in court who are also
21   associated with Grace Church who are here in support of
22   him.  He volunteers at Grace Church.  And when there are
23   events at times and helps with set up and clean up.  He
24   also helps to make sure that his children get to
25   doctors' appointments.  He is there without fail at the
```

```
 1                      USA V. DILBAR GUL DILBAR
 2    end of the day to meet them when they get off the school
 3    bus.  His school age children attend school locally.
 4    They are getting very good at English.  His wife has a
 5    learner's permit, she hopes to learn to drive, although
 6    she cannot yet drive.  So it has fallen on him up to
 7    this point to do all of the grocery shopping,
 8    pediatricians, and other errands.  He works overnight at
 9    a full-time job and has no prior criminal history
10    whatsoever.  So, in other words, he has, in one year, I
11    think, gotten far more connected with his community than
12    many others who have relocated to the Rochester area.
13    And I think the strongest testament to that is the
14    presence of these people who are here today in support
15    of him, the fact that there is an individual who is also
16    from our community who is willing to act as third-party
17    custodian.
18              With respect to the burden of proof, you
19    know, the Court is obviously familiar with it.  It's our
20    contention that there is not a serious risk of flight
21    that if the Court, even if the Court disagrees, it's our
22    contention that the conditions that we propose address
23    that issue that the government has failed to demonstrate
24    there are no conditions that would reasonably assure my
25    client's return to court.
```

```
 1                    USA V. DILBAR GUL DILBAR
 2              With respect to, I think, a little bit more
 3    information about that standard, I would cite the
 4    Friedman, F-r-i-e-d-m-a-n, case at 837 F. 2d 48.  And in
 5    that case, the Second Circuit made clear that it
 6    required "more than evidence of the commission of a
 7    serious crime and the fact of a potentially long
 8    sentence to support a finding of risk of flight."
 9              Based on all of these factors, your Honor,
10    we would ask you to deny the government's motion and
11    release Mr. Dilbar on the conditions that I've proposed.
12              MAGISTRATE JUDGE HOLLAND:  Thank you, Ms.
13    Burger.
14              Ms. McGuire, anything -- well, I'll give you
15    an opportunity to respond to Ms. Burger's arguments.
16              MS. MCGUIRE:  Just a few points, your Honor.
17    To start with, the purported Irrevocable Waiver of
18    Extradition.  It's my understanding that there are a
19    number of countries that do not honor this waiver.  One
20    of those countries is Canada.  I believe this issue was
21    discussed, maybe litigated is too strong a word, but
22    discussed in the case of United States v. Moses where
23    the defendant made a bail application, he had ties
24    specifically to Canada, offered to sign an Irrevocable
25    Waiver of Extradition and Judge Wolford agreed that it
```

```
 1                    USA V. DILBAR GUL DILBAR
 2    was ineffectual and denied his bail application.
 3              MAGISTRATE JUDGE HOLLAND:  Was that -- and
 4    I'm sorry -- was that after his conviction?
 5              MS. MCGUIRE:  Post trial, yes, your Honor.
 6              MAGISTRATE JUDGE HOLLAND:  All right.
 7              MS. MCGUIRE:  And, again, all of these cases
 8    that were referenced, 43 with this charge, only 10 where
 9    anyone got out.  We have no idea what the ultimate
10    resolution of those cases are, but they all seem pretty
11    dated and we're living in a pretty different
12    geopolitical climate right now where extradition has
13    always been difficult, including from Canada.  There is
14    no guarantee that we'll be able to extradite someone
15    from any country right now or that we should have to go
16    through those steps.
17              There is also a reference to the supporters
18    in the courtroom and a proposed third-party custodian
19    and the sentiment that these are people who are not
20    easily duped.  The United States Government is also not
21    easily duped, but it was in this case.  And these people
22    have been duped in this case as well.  It is clear from
23    the bail report in black and white that the person
24    proposing to act as a third-party custodian has no idea
25    about this defendant's past.
```

```
 1                    USA V. DILBAR GUL DILBAR
 2              I would also note there was some talk about
 3    whether he was fearful of the case or fearful of jail,
 4    and that perhaps his mental health struggles center
 5    around his exposure to jail time or being in jail.  He
 6    is facing a maximum of 10 years imprisonment and the
 7    stress and anxiety that jail apparently creates for him
 8    is an additional incentive for him to flee because he is
 9    facing jail time.  Any individual who had this charge
10    and received time served at the end of it, I can
11    guarantee was incarcerated during the pendency of the
12    case.  They didn't serve no jail time, they were
13    incarcerated and that was their time served.  That is
14    just a guess, but I think it's a pretty good guess based
15    on my general knowledge of my office.
16              And, you know, that is all I needed to
17    respond to, your Honor.
18              MAGISTRATE JUDGE HOLLAND:  All right.  Ms.
19    Burger.
20              MS. BURGER:  Your Honor, if I could speak
21    briefly.
22              MAGISTRATE JUDGE HOLLAND:  Yes.
23              MS. BURGER:  I would look at the how the
24    Hossain, H-o-s-s-a-i-n, case, 20CR107, it's a case
25    involving fraud in application or a green card.  In that
```

                    USA V. DILBAR GUL DILBAR

1
2   case, the government did not move for Mr. Hossain's
3   detention, and he got a year probation as a sentence.  I
4   agree with the government that certainly times have
5   changed and I don't expect that under the current
6   administration, the government would consent to any
7   alien's release.  I think the point of the fact that
8   other individuals have been released by agreement of the
9   government in these types of cases and that in some
10  cases it was over the government's objection, I think
11  I'm offering for another point.  And it seems to me that
12  the government's argument that my client could face up
13  to 10 years in prison, that is the statutory maximum,
14  but we all know that at sentencing, the Court is
15  required to begin by correctly calculating the
16  Guidelines.  And one thing that is notable is that the
17  government has not said that my calculations are dead
18  wrong and that there is some other enhancement or some
19  other sentencing factor in the Guidelines that would
20  result in a range after trial of something greater than
21  zero to six months.  Thank you.
22              MS. MCGUIRE:  Your Honor, if I could just
23  briefly respond to the notion that the government would
24  never consent to the release of an alien, that is
25  absolutely not true.  There are people who are here

```
 1                    USA V. DILBAR GUL DILBAR
 2    legally and illegally.  The government makes and I
 3    personally take offense, I, when I make my motions, make
 4    an individualized assessment of the defendant and the
 5    case, as we're required to do under the bail statute.
 6                    MAGISTRATE JUDGE HOLLAND:  Of course I'm
 7    going to consider this case on its own merits and the
 8    specifics of this case and I will take into account the
 9    particulars of what Mr. Dilbar's charged with and
10    everything that has been presented to me today.
11                    Ms. Burger, let me ask you a legal question,
12    which is, you made the argument that you contend that he
13    does not present a serious risk of flight and so under
14    3142(f) that is a gateway question, a threshold
15    question.  That is what even opens the door to
16    detention.  But, would you agree that doesn't, let's say
17    I were to hypothetically agree that that was the case,
18    that would not then prohibit the Court from imposing
19    conditions beyond the standard conditions?
20                    MS. BURGER:  Absolutely, I agree, that's
21    correct.
22                    MAGISTRATE JUDGE HOLLAND:  Okay.  I need
23    more time to make my decision and to consider everything
24    that has been presented as well as the applicable legal
25    standard and so I am going to -- what I would like to do
```

```
 1              USA V. DILBAR GUL DILBAR
 2   is set this down for an appearance sometime maybe next
 3   Tuesday, if you're available.
 4              MS. BURGER:  That's fine.
 5              MAGISTRATE JUDGE HOLLAND:  Ms. McGuire.
 6              MS. MCGUIRE:  All right.  I'm scrambling.
 7   Yes, I'm wide open, Judge.
 8              MAGISTRATE JUDGE HOLLAND:  So, Mr. Fowler,
 9   when next Tuesday could we schedule this?
10              THE CLERK:  We could put this down at -- we
11   could put this down at 11 a.m. or Tuesday.
12              MS. MCGUIRE:  That works for me.  Thank you.
13              MS. BURGER:  Thank you.
14              MAGISTRATE JUDGE HOLLAND:  So we'll schedule
15   this for a further, well, I guess it would technically
16   be a continuation of this hearing, but I will be
17   prepared to issue my decision at that time.  In the
18   meantime, I would note that the time continues to be
19   excluded from the speedy trial clock because the
20   government's motion is actually under advisement by the
21   Court.
22              Is there anything else that we need to
23   address, Ms. Burger?
24              MS. BURGER:  No, thank you.
25              MAGISTRATE JUDGE HOLLAND:  Ms. McGuire?
```

```
1              USA V. DILBAR GUL DILBAR
2              MS. MCGUIRE:  No, thank you.
3              MAGISTRATE JUDGE HOLLAND:  Officer Nenni.
4              PROBATION:  No, your Honor.  Thank you.
5              MAGISTRATE JUDGE HOLLAND:  All right.  Thank
6    you very much.
7              MS. MCGUIRE:  Thank you.
8
9
10
11              CERTIFICATE OF REPORTER
12
13     I certify that the foregoing is a correct transcript
14   of the record to the best of my ability of proceedings
15   transcribed from the audio in the above-entitled matter.
16
17   S/ Karen J. Clark,  RPR
18   Official Court Reporter
19
20
21
22
23
24
25
```

# Exhibit 3

1

```
08:54:02    1
09:06:15    2                    UNITED STATES DISTRICT COURT
                                 WESTERN DISTRICT OF NEW YORK
            3

            4
               - - - - - - - - - - - - - X
            5   UNITED STATES OF AMERICA    )        25MJ4055
                                Plaintiff   )
            6   vs.
                                                     Rochester, New York
            7   DILBAR GUL DILBAR           )         May 13, 2025
                                Defendant.           11:00 a.m.
            8   - - - - - - - - - - - - - X
                CONTINUATION OF DETENTION HEARING
            9   Transcribed from an Electronic Recording Device

           10              TRANSCRIPT OF PROCEEDINGS
                      BEFORE THE HONORABLE COLLEEN D. HOLLAND
           11              UNITED STATES MAGISTRATE JUDGE

           12

           13   FOR PLAINTIFF:   MEGHAN K. MCGUIRE, ESQ.
                                 Assistant United States Attorneys
           14                    100 State Street
                                 Rochester, New York 14614
           15

           16
                FOR DEFENDANT:   ANNE M. BURGER, ESQ.
           17                    Assistant Federal Public Defender
                                 28 East Main Street, Suite 400
           18                    Rochester, New York 14614

           19

           20                    K. NENNI, USPO

           21

           22                    Tofan Dawarzai, Pashto Interpreter

           23

           24   COURT REPORTER: Karen J. Clark, Official Court Reporter
                                 Karenclark1013@AOL.com
           25                    100 State Street, 6th Floor
                                 Rochester, New York 14614
```

2

USA V. DILBAR GUL DILBAR

**P R O C E E D I N G**

\*               \*               \*

THE CLERK:  We are on the record in the
matter of United States Dilbar Gul Dilbar, 25MJ4055.
The matter is on for a continuation of the detention
hearing.

THE COURT:  Mr. Fowler, can you please swear
in our interpreter?

(Interpreter was administered the oath by
the Courtroom Deputy.)

THE COURT:  We are on this morning for a
continuation of our detention hearing.  I have one item
that I would like to put on the record which is that I
did have, after our last appearance, a conversation with
Officer Nenni.  One of the things that had been brought
to my attention during the detention hearing was that
Mr. Dilbar had applied for a security guard license.  I
asked Officer Nenni if they had any information about
whether or not he actually received that license.
Officer Nenni indicated to me she did not have that
information.  I understand that she made some efforts to
obtain that information and but was not able to confirm

                    USA V. DILBAR GUL DILBAR

that.

          And, Officer Nenni, if you would like to
address that.

          PROBATION:  That's correct, your Honor.
Just doing a general search on the Department of State
licensing website with the defendant's name as it
appears on the Complaint, I didn't find records, however
that is not to mean that all of the search information
that was entered was completely accurate.  I did make
efforts to call the main numbers for the Department of
Licensing Division, and, unfortunately, I was unable to
get in contact with a real person to see if that was
ever issued.  So, at this point, I don't know for sure
if the application was granted.

          THE COURT:  All right.  Ms. McGuire, I don't
know or, Ms. Burger, I don't know if either of you know
whether or not he actually possesses a security guard
license.

          MS. BURGER:  If I could have a moment.  Your
Honor, I do not believe that New York State has issued a
license to my client.  What I don't know is whether that
application is still being considered by New York State
or whether it's been rejected.  But I can tell you, he
has not received a license.

4

```
 1                    USA V. DILBAR GUL DILBAR
 2              THE COURT:  All right.
 3              MS. MCGUIRE:  We have the same information,
 4    your Honor.
 5              THE COURT:  All right.  Thank you.  I am
 6    prepared to issue a decision.  But is there anything
 7    else that anyone needs to bring to my attention before I
 8    do so?  Ms. Burger?
 9              MS. BURGER:  No, thank you.
10              THE COURT:  Ms. McGuire?
11              MS. MCGUIRE:  No, thank you.
12              THE COURT:  All right.  Mr. Dilbar is
13    charged by Criminal Complaint with VISA fraud in
14    violation of 18 U.S.C. Section 1546(a).  The government
15    has moved for detention pursuant to 18 U.S.C. Section
16    3142(f)(2)(A) on the basis that Mr. Dilbar presents a
17    serious risk of flight.  "In our society, liberty is the
18    norm and detention prior to trial or without trial is
19    the carefully limited exception."  *United States v.*
20    *Salerno*, 481 U.S. 739, 755 Supreme Court 1987.  The
21    government's motion is governed by the Bail Reform Act
22    of 1984, which permits a federal court to detain a
23    defendant pending trial only if during an adversary
24    hearing the government demonstrates by a preponderance
25    of the evidence that no condition or combination of
```

```
 1                USA V. DILBAR GUL DILBAR
 2   conditions will reasonably assure the appearance of the
 3   person as required or by clear and convincing evidence
 4   that no condition or combination of conditions will
 5   reasonably assure safety of any other person and the
 6   community.  "First, however, the government must
 7   establish by a preponderance of the evidence that it is
 8   entitled to a detention hearing." United States v.
 9   Watkins, 940 F. 3d 152 at 158, Second Circuit 2019.  The
10   government can meet that burden by demonstrating that
11   the charged offense falls within one of the
12   subcategories set forth in 18 U.S.C. Section
13   3141(f)(1)(A) through (E) or that the defendant poses a
14   serious risk of flight or that there is a serious risk
15   that the defendant will attempt to obstruct justice or
16   threaten, injure or intimidate a witness or juror.
17   Section 3142(f) "thus performs a gate-keeping function,"
18   Watkins 940 F. 3d at 158 and is "the gateway for both a
19   detention hearing and any eventual detention," United
20   States v. Bagby, 2015 Westlaw 8678394 at *2, Western
21   District of New York, December 14th, 2015.
22           Here, as I've already noted, the government
23   seeks detention pursuant to Section 3142(f)(2)(A) and
24   thus bears the initial burden by demonstrating by a
25   preponderance of the evidence that Mr. Dilbar presents a
```

```
 1                    USA V. DILBAR GUL DILBAR
 2    serious risk of flight. "A serious risk of flight means
 3    a great risk beyond average that the defendant will
 4    intentionally and actively move within or outside of the
 5    jurisdiction to avoid court proceedings or supervision."
 6    United States v. Romero-Martinez, 2024 Westlaw 965150 at
 7    *4, District of Connecticut, March 6, 2024.  The
 8    government is not required to show that it is more
 9    likely than not that the defendant will flee, but that
10    it is more likely than not that there is a serious risk
11    that the defendant will flee.  This threshold burden has
12    been described as "very low" and "extremely light."
13    United States v. Marroquin-Ramirez, 2025 Westlaw 1248652
14    at *3, Northern District of New York, April 17, 2025.
15            At the first step of the analysis, I find
16    that the government has met its burden to demonstrate by
17    a preponderance of the evidence that there is a serious
18    risk that Mr. Dilbar will flee.  The Court's focus at
19    this stage is on evidence of the defendant's ability and
20    motivation to flee," Marroquin-Ramirez at *3.  The
21    government has proffered that Mr. Dilbar engaged in a
22    sustained course of fraud dating back to 2016 in support
23    of his efforts to obtain admission to the United States.
24    This includes submission of a forged COM approval letter
25    in support of his first VISA application followed by
```

```
 1                    USA V. DILBAR GUL DILBAR
 2   efforts to obtain an employment letter from places where
 3   he was never employed, and then the purchase of
 4   fraudulent employment letters and fraudulent employment
 5   verification.  In 2021, Mr. Dilbar used the purchased
 6   fraudulent employment letters to obtain a COM approval
 7   letter, which allowed him to proceed with a second VISA
 8   application.  Mr. Dilbar lied on the VISA application
 9   stating, under penalty of perjury, stating that he never
10   had been denied of a VISA.
11             Further, as the government has proffered
12   that since arriving in the United States, Mr. Dilbar has
13   continued to be in contact with an individual who
14   falsified his second employment letter, having exchanged
15   identification documents, and Mr. Dilbar having made an
16   additional payment to this individual for an unknown
17   purpose.  Mr. Dilbar's records also show contacts with a
18   second individual who is under investigation for
19   large-scale fraud related to the Afghan Special
20   Immigrant VISA program.  And, of particular concern to
21   the Court, when law enforcement searched Mr. Dilbar's
22   residence, they found VISAs and identity documents
23   belonging to other Afghan nationals who do not live in
24   that residence, and one of whom who does not live in New
25   York.  I agree with the government, this information
```

8

```
 1                  USA V. DILBAR GUL DILBAR
 2   suggests that Mr. Dilbar, even having obtained admission
 3   to the United States for himself and his family,
 4   continues to engage in fraud.  And then that, in turn,
 5   supports the conclusion that he would have access to
 6   fraudulent documents to aid him in any attempts to flee.
 7   I further note that Mr. Dilbar and his family are
 8   experienced with international travel having previously
 9   traveled to the United States from Afghanistan,
10   including with a roughly seven-month stop in Albania.
11   And while the information that I have before me suggests
12   that he has modest financial resources, he was
13   previously able to access adequate funds to purchase
14   fraudulent documents.
15            Mr. Dilbar also has a motive to flee.  Not
16   only is he facing a serious criminal charge, but the
17   potential collateral consequences of a conviction for
18   himself and his family are also serious.  He has lived
19   in the United States and this community for only one
20   year.  And while he certainly has made connections in
21   that time, they are not the sort of long-standing ties
22   that would make it extremely difficult or impossible to
23   uproot himself and his family to a different location.
24   And so I, as I said, under these circumstances, I find
25   that the government has satisfied its threshold burden
```

```
1                    USA V. DILBAR GUL DILBAR
2    of demonstrating that Mr. Dilbar presents a serious risk
3    of flight.
4                    I, therefore, must turn to the second step
5    of the analysis, which is to consider "whether any
6    condition or combination of conditions of release will
7    protect the safety of the community and reasonably
8    assure the defendant's appearance at trial." United
9    States v. Friedman, 837 F 48 at 49, Second Circuit 1988.
10   The government has not argued that no such conditions
11   exist with respect to the safety of the community.
12   Accordingly the question before me is whether the
13   government has demonstrated by a preponderance of the
14   evidence that no condition or combination of conditions
15   can reasonably assure Mr. Dilbar's future appearance.
16                   In making my determination, I must consider
17   the factors set forth at 18 U.S.C. Section 3142(g),
18   which are commonly referred to as the "(g)" factors.
19   They include:
20                   The nature and circumstances of the offense
21   charged; the weight of the evidence against the person;
22   the history and characteristics of a person, including
23   the person's character, physical and mental condition,
24   family ties, employment, financial resources, length of
25   residence in the community, community ties, past
```

```
 1                    USA V. DILBAR GUL DILBAR
 2   conduct, history relating to drug or alcohol abuse,
 3   criminal history and record concerning appearance at
 4   court proceedings, as well as whether at the time of
 5   current offense or arrest the person was on probation,
 6   on parole or on other release pending trial, sentencing
 7   appeal or completion of sentence for an offense under
 8   federal state or local law; and, finally, the nature and
 9   seriousness of the danger to any person or the community
10   that would be posed by the person's release.
11           I turn first to the nature and circumstances
12   of the offense charged.  VISA fraud is a serious crime.
13   It undermines the security of the United States by
14   depriving its officials of accurate information in
15   connection with admission decisions.  Further, it
16   diverts resources to those who are engaging with the
17   system honestly and in good faith.  And as discussed
18   above in this particular case, the government has
19   proffered that Mr. Dilbar engaged in a sustained course
20   of fraud and seemingly has the means and ability to
21   obtain fraudulent documents.  On the other hand, VISA
22   fraud is not a violent crime.  Further, the government
23   has acknowledged that Mr. Dilbar did work as a
24   translator for some period of time and it's unclear
25   whether he worked for long enough to qualify under the
```

USA V. DILBAR GUL DILBAR

Afghan Special Immigrant VISA program.  And given his
lack of any criminal history, if convicted, Mr. Dilbar
would not be facing a significant recommended sentence
under the Guidelines.  The defense has proffered that
based on the discovery produced thus far, his expected
Guidelines range, if convicted, would be zero to six
months of imprisonment.

I next consider the weight of the evidence
based on the information presented to me at the
detention hearing.  The weight of the evidence against
Mr. Dilbar appears to be strong.  The government has
identified multiple instances of fraudulent conduct by
Mr. Dilbar, including what appears to be a
straightforward instance of lying about having
previously had a VISA application denied.

Turning to the history and characteristics
of the person.  I find this to be the most significant
factor in my analysis.  Mr. Dilbar has no criminal
history nor any history of failing to comply with court
orders or appear for court.  He has steady employment
and has been with his employer for a year.  Mr. Dilbar
has lived in the Western District of New York for the
last year and has developed ties to the community during
that time.  He and his family are involved with two

```
 1                    USA V. DILBAR GUL DILBAR
 2   different religious communities, attending services at
 3   both, and have forged personal relationships with the
 4   members thereof.  Though there is evidence that Mr.
 5   Dilbar has not been entirely truthful with these
 6   individuals regarding his personal history.  Mr.
 7   Dilbar's wife and five children, who are ages 7, 6, 5, 1
 8   and 1-month, reside in the Western District of New York.
 9   The youngest child was born in the United States and is
10   a citizen of this country.  The older children, the
11   school age children, attend school in the community.
12   However, he does have other close family members,
13   including his parents and siblings who live in
14   Afghanistan.
15            Mr. Dilbar has modest financial resources.
16   He has no reported history of mental illness or mental
17   health treatment.  But he did report experiencing
18   symptoms of anxiety related to being taken into custody
19   in this matter.  He also has no history of substance
20   abuse.
21            Finally, I consider the nature and
22   seriousness of the danger to any person or the community
23   that would be posed by Mr. Dilbar's release.  As I've
24   already noted, there is a danger inherent in VISA fraud
25   because it deprives the United States of information it
```

```
 1                    USA V. DILBAR GUL DILBAR
 2   needs to make informed admission decisions and allows in
 3   individuals who have not been appropriately vetted.
 4   However, Mr. Dilbar has no noted history of violent
 5   conduct, nor ties to any violent individuals or
 6   organizations.
 7             This was not an easy or clearcut decision.
 8   There are factors and evidence tipping in both
 9   directions.  But having carefully considered all of the
10   information that has been presented, including,
11   particularly, Mr. Dilbar's lack of any criminal history
12   or failure to appear, the low Guidelines range that is
13   likely to apply in the event of a conviction, and the
14   modest financial resources available to Mr. Dilbar, I
15   have concluded, while Mr. Dilbar presents a serious risk
16   of flight, that risk can be appropriately managed with
17   conditions.  Those conditions which I am about to set
18   forth are numerous and they are extremely stringent, but
19   I find, in combination, they will reasonably assure Mr.
20   Dilbar's appearance.
21             First, I am going to impose a condition of
22   home detention with location monitoring.  What that
23   means, Mr. Dilbar, is you will be fitted with a location
24   monitor and you'll be permitted to leave your home for
25   employment, education, religious services, medical,
```

```
 1                    USA V. DILBAR GUL DILBAR
 2    substance abuse or mental health treatment, attorney
 3    visits, court appearances, court ordered obligations or
 4    other activities approved in advance by the pretrial
 5    services office or your supervising officer.  You will
 6    also be required to pay all or part of the cost of
 7    location monitoring based upon your ability to pay as
 8    determined by the pretrial services office or
 9    supervising officer, and to refrain from obstructing or
10    attempting to obstruct or tamper in any fashion with the
11    efficiency and accuracy of electronic monitoring, which
12    is required by the conditions of release.
13              Second, I'm going to limit Mr. Dilbar's
14    travel to Monroe County.  That means even when you leave
15    your home for those permitted purposes - employment,
16    doctors' appointments and the like - you must remain
17    within Monroe County.
18              Third, I'm going to require that Mr. Dilbar
19    provide pretrial services with full access to all of his
20    financial accounts and permit pretrial services to
21    monitor the same.
22              Fourth, I am going to impose a computer
23    monitoring condition and require that Mr. Dilbar
24    participate in the computer and internet monitoring
25    program administered by the United States Probation
```

```
 1                USA V. DILBAR GUL DILBAR
 2   Office.
 3            Fifth, I'm going to require Mr. Dilbar to
 4   undergo a mental health evaluation and to participate in
 5   mental health treatment, if directed, by the pretrial
 6   services office or the supervising officer.
 7            Sixth, I am going to require Mr. Dilbar to
 8   post a $6,000 cash bond fully secured by cash deposited
 9   with the Clerk of the Court.  This constitutes the full
10   amount in his savings account.
11            Seventh, to the extent that Mr. Dilbar is
12   still in the process of seeking to obtain a security
13   guard license or any license has been obtained, I am
14   going to require that he withdraw his application or if
15   he has obtained a security license or one is issued,
16   that he immediately surrender it.
17            Eighth, I'm going to require that Mr. Dilbar
18   surrender his passport and his minor children's
19   passports to the Clerk of the Court, and that they not
20   apply or obtain a new passport or international travel
21   documents.  And I want to elaborate on this requirement.
22   First, I acknowledge that Mr. Dilbar's passport has, to
23   my understanding, been seized by the government.  But I
24   want to make clear that should that passport be returned
25   to him for any reason, he must immediately turn it over
```

```
 1                  USA V. DILBAR GUL DILBAR
 2   to the Court.  As to his minor children's passports,
 3   because I believe that the risk in this case is that Mr.
 4   Dilbar would attempt to flee with his family, I conclude
 5   that surrender of these documents is necessary to assure
 6   Mr. Dilbar's future appearance.  And with respect to my
 7   authority to impose such a condition, I cite the
 8   following cases where courts have either imposed or have
 9   considered imposing, but ultimately detained individuals
10   with respect to the same or more restrictive conditions.
11   The cases are United States v. Harry, 2021 Westlaw
12   3076905, at *2, District of New Jersey from July 21,
13   2021, where the Court discussed its determination that
14   "release will also include travel restrictions, home
15   incarceration and surrender of his and his children's
16   passports."  United States v. Mohammad, 2017 Westlaw
17   2365247 at *1, Northern District of Ohio, May 31, 2017,
18   where the Court considered, but then ultimately detained
19   the individual, but considered one of the conditions was
20   that "Mr. Mohammad will be subject to home confinement,
21   electronic location monitoring, curfew and other
22   standard restrictions required by 18 United States
23   Section 3142(c), including surrender of his passport and
24   the passports of his wife, children and father-in-law."
25   And United States v. Agriprocessors, 2009 Westlaw
```

```
 1                    USA V. DILBAR GUL DILBAR
 2    290473, at *8, Northern District of Iowa, January 28th,
 3    2009, where the Court concluded that "in the
 4    Undersigned's view, a substantial security bond, active
 5    GPS, electronic monitoring, travel restrictions and
 6    surrender of the passports and birth certificates of the
 7    defendant, his wife, and their minor children should
 8    reasonably assure defendant's presence."
 9            Ninth, I'm going to require Mr. Dilbar to
10    sign an Irrevocable Waiver of Extradition.  I will note,
11    I am skeptical regarding the practical value of such a
12    document and that it has not played a role in my
13    decision making, but Mr. Dilbar has offered to sign such
14    a waiver and I cannot say conclusively that it would
15    never be of use, and so I will impose that as a
16    condition.
17            Tenth, I am going to require Mr. Dilbar to
18    report to pretrial services as directed and I am not
19    going to allow Mr. Dilbar to be released from the jail
20    and to then report to pretrial services.  I am going to
21    request that he be brought to the courthouse and then
22    sent directly to pretrial services to be fitted with his
23    electronic location monitor.
24            Eleventh, I am going to prohibit Mr. Dilbar
25    from any use of alcohol.
```

```
 1                    USA V. DILBAR GUL DILBAR
 2              Twelfth, I'm going to prohibit Mr. Dilbar
 3    from possessing a firearm, destructive device or any
 4    other weapon.
 5              Thirteenth, Mr. Dilbar must report within 72
 6    hours to pretrial services any contact with any law
 7    enforcement personnel, including, but not limited to,
 8    any arrest, questioning or traffic stop.
 9              Fourteenth, I am going to appoint David
10    Hough as a third-party custodian.  Is Mr. Hough present
11    in the courtroom?
12              All right.  I would like to have Mr. Hough
13    come forward for a moment because I want to confirm that
14    he understands what it means to be a third-party
15    custodian.  So you can step up to this podium here, Mr.
16    Hough.  All right.
17              So, Mr. Hough, what that means, and, I'm
18    sorry, just give me a second, is that you would be
19    agreeing to supervise Mr. Dilbar in accordance with all
20    of the conditions of release, to use every effort to
21    assure Mr. Dilbar's appearance at all court proceedings,
22    and to notify the Court immediately in the event that
23    Mr. Dilbar violates any conditions of release or is no
24    longer in your custody.  Do you understand that?
25              And you are willing to take on that
```

```
 1                   USA V. DILBAR GUL DILBAR
 2   responsibility?
 3             MR. HOUGH:  I am.
 4             THE COURT:  And you are able to take on that
 5   responsibility?
 6             MR. HOUGH:  I didn't have a chance to review
 7   what our legal counsel gave us as far as what the
 8   responsibilities are that position of third-party
 9   custodian.  I think I can fit those.  I only do have
10   one.  I do go away for my mother's funeral for a week or
11   two, how that would impact my abilities to perform?
12             THE COURT:  I'm sorry to hear of your loss.
13   When is your is mother's funeral?
14             MR. HOUGH:  Still scheduling that.  She
15   passed away, actually, Christmas Eve.  We're trying to
16   do that possibly in June.
17             THE COURT:  That would be something that
18   would have to be addressed and we would probably have to
19   have a further court appearance regarding what would
20   happening during that period.  So you would have to make
21   the Court aware of that ahead of time.  And that would
22   be part of immediately notifying the Court if you were
23   no longer able to serve and to perform your duties as
24   third-party custodian.  All right?
25             MR. HOUGH:  Yes.
```

```
1                    USA V. DILBAR GUL DILBAR
2           THE COURT:  Okay.  Thank you, Mr. Hough.
3           MR. HOUGH:  Thank you.
4           THE COURT:  In addition, the standard
5   conditions of release shall apply.  I also will not
6   permit Mr. Dilbar to be released until the cash bond is
7   posted.  And I am going to require the defense to
8   prepare and submit to me for my review a proposed form
9   for the irrevocable waiver of extradition.
10          MS. BURGER:  Your Honor, I did prepare one
11  and I have copies, I can hand that up now.  I don't know
12  that it will be acceptable.
13          THE COURT:  All right.  All right.  Ms.
14  McGuire, I appreciate that the government has asked me
15  to detain Mr. Dilbar, and is not agreeing to any
16  conditions of release.  I appreciate further that the
17  government has expressed, and as I indicated, I share
18  skepticism about the practical value of this waiver that
19  having been said does the government have any specific
20  objections to the form of the waiver that has been
21  prepared by the defense.
22          MS. MCGUIRE:  I mean, on first blurb, based
23  on paragraph four, it looks like it only applies to
24  countries that do not have an extradition treaty with
25  the U.S.  I would want it to apply to every country
```

```
 1                    USA V. DILBAR GUL DILBAR
 2   regardless of whether there is a treaty.
 3            MS. BURGER:  Your Honor, this is basically
 4   tailored on one of the cases that I cited during the
 5   detention hearing.  My understanding is that with
 6   respect to the first paragraph, waiving -- irrevocably
 7   waiving any and all rights I may have to contest
 8   extradition anywhere in the world regarding this case.
 9            THE COURT:  I see that with the paragraph.
10            MS. BURGER:  With respect to specifically
11   non-extradition countries in that other matter, that was
12   added, I think, as an assurance so that if the country
13   was specifically a country that it did not extradite,
14   that it also would waive, I think that is why it's
15   broken out separately in that fourth paragraph in the
16   document.
17            THE COURT:  All right.
18            MS. MCGUIRE:  I would say, regardless of
19   whether or not there is extradition, I would hate to
20   spend months of litigation over a textual interpretation
21   in an international court.
22            THE COURT:  Well, this is something that we
23   can have, I will take a closer further look at this and
24   ascertain whether or not it is acceptable to me because,
25   as I indicated, my intention is not to have Mr. Dilbar
```

```
 1                    USA V. DILBAR GUL DILBAR
 2   be released today anyway because I need to have the cash
 3   bond fully secured before I would allow that.  And as I
 4   intend to now inquire with Ms. McGuire whether or not
 5   she would like a stay so that she can appeal this
 6   decision.
 7              MS. MCGUIRE:  Yes, please.
 8              THE COURT:  How long would you like for
 9   that?
10              MS. MCGUIRE:  Could I have until 5 o'clock
11   tonight, we'll move in front of the district court for a
12   further stay pending the resolution of the appeal.
13              THE COURT:  Yes.  I will stay my order until
14   5 o'clock tonight to give the government an opportunity
15   to appeal.
16              MS. BURGER:  Your Honor, I would request
17   that when a Court has been identified that Ms. McGuire
18   notify the district court that I will weigh in when the
19   government's documents are filed with respect to the
20   stay and the merits of the appeal.
21              THE COURT:  All right.  Ms. McGuire.
22              MS. MCGUIRE:  My expectation, the Court will
23   order briefing once the transcripts are ready, so I
24   don't think they would do anything without both parties
25   weighing in on the merits, but I'm happy to advise them.
```

```
 1                    USA V. DILBAR GUL DILBAR
 2              MS. BURGER:  It's not with respect to the
 3    merits of the stay, the last situation that I had with
 4    the government, not Ms. McGuire, but they sought a stay
 5    with a district court, and before I had an opportunity
 6    to oppose a continued stay, the district court granted
 7    the stay, so I simply want to make sure.
 8              THE COURT:  So you would like it to be noted
 9    that the defense opposes any continued stay.
10              MS. BURGER:  Yes.
11              THE COURT:  And would like to be heard on
12    the matter.
13              MS. MCGUIRE:  Well then, your Honor, I would
14    ask for a stay on your part for longer than 5 p.m. today
15    because if your stay expires by 5 p.m., and the defense
16    wants an opportunity to brief the issue of a stay, it
17    won't necessarily be entered by the district court by 5
18    p.m., and we'll end up with a gap.
19              THE COURT:  That seems reasonable to me, Ms.
20    Burger, I understand you would like to be heard if there
21    is going to be a stay.  Obviously, there is a delay in
22    getting the transcripts and the like, and so I
23    understand if you would like to be heard on a more
24    extended stay, but I do agree with Ms. McGuire, she
25    should have longer than 5 p.m. if that is the case.
```

USA V. DILBAR GUL DILBAR

1

2          MS. BURGER:  I would be fine for 5 p.m.

3   tomorrow, your Honor.  That would allow the government

4   to have not only the rest of the day today for a judge

5   to be identified, but also allow them to file by the end

6   of the day tomorrow.

7          THE COURT:  Ms. McGuire.

8          MS. MCGUIRE:  No objection.

9          THE COURT:  All right.  So I am going to

10  stay it until 5 p.m. tomorrow to allow the government an

11  opportunity to seek an appeal.

12          Officer Nenni, I know it was a lot of

13  conditions, some of which are not standard conditions,

14  were you able to prepare a release order.

15          PROBATION:  I have the conditions of

16  release.  The only question I had, I may have missed

17  this, but one of the other conditions on the page two

18  just states that the defendant has to remain at a

19  verifiable address as approved by pretrial.

20          THE COURT:  I don't think I stated that, but

21  I did mean to impose that.  Thank you, Officer Nenni.

22          MS. BURGER:  Your Honor, I know that these

23  conditions of release will be publically filed.  Given

24  Mr. Hough's phone number is going to be on here, would

25  the Court permit any public filing of this to be

```
 1                  USA V. DILBAR GUL DILBAR
 2   redacted with respect to his phone number?
 3              THE COURT:  Any objection to that, Ms.
 4   McGuire.
 5              MS. MCGUIRE:  I'm sorry, I didn't hear that.
 6              THE COURT:  So Mr. Hough's phone number is
 7   on the release order and the defense has requested that
 8   that be redacted from the public version.  Does the
 9   government have any objection to that request?
10              MS. MCGUIRE:  Not to the phone number, no.
11              THE COURT:  All right.  And Mr. Dilbar, I
12   know that you just discussed this with your counsel, but
13   I want to make sure that you understand that you have
14   agreed to abide by the conditions that I just explained
15   to you and you will abide by those conditions if you are
16   released.
17              THE DEFENDANT:  Yes.
18              THE COURT:  All right.  I think we need to
19   have -- he signed it, but the space for the city and
20   state is blank still.
21              MS. BURGER:  I can write it.
22              THE COURT:  On the acknowledgement, if that
23   could be filled out.
24              MS. BURGER:  Okay.
25              THE COURT:  All right.  Thank you.  All
```

```
1                    USA V. DILBAR GUL DILBAR
2   right.  So then, obviously, the government has the right
3   and will pursue its appeal of that order to the district
4   court, but other than that, what, Ms. Burger, would you
5   like to do to proceed in this matter?
6               MS. BURGER:  So, as I mentioned during the
7   detention hearing, the government has begun the process
8   of producing voluntary discovery.  I expect that process
9   will continue and will take some time.  My ask is that
10  the Court agree to schedule a status appearance for us
11  to get together, again, maybe in about 60 days.  I'm not
12  asking for a preliminary hearing to be scheduled at this
13  point.
14              THE COURT:  All right.  Ms. McGuire, any
15  objection to that request?
16              MS. MCGUIRE:  I'd ask that we actually do 30
17  days.  If this defendant is ultimately released, I don't
18  want to go more than 30 days without having him in
19  court.
20              THE COURT:  All right.  I will set it out
21  for 30 days then because, by that point, we should know
22  whether or not his custody -- we'll know by that point
23  presumably, what his custody status will be so we can
24  have a better ability to decide how to proceed.
25              So, Mr. Fowler, what do we have 30 days out?
```

```
 1                    USA V. DILBAR GUL DILBAR
 2              THE CLERK:  Looking approximately 30 days
 3    out, that would put us to June 12th.  I want to confirm
 4    the availability of our interpreter on June 12th at 10
 5    a.m.
 6              INTERPRETER:  Yes.
 7              THE CLERK:  Does that work, counsel?
 8              MS. BURGER:  Yes.
 9              MS. MCGUIRE:  Yes, thank you.
10              THE COURT:  We'll set this for a status
11    conference on June 12th at 10 a.m.
12              And, Ms. Burger, are you asking for an
13    interest of justice exclusion until then?
14              MS. BURGER:  I am.
15              MS. MCGUIRE:  Government joins in that
16    request.
17              THE COURT:  All right.  The joint request
18    for an interest of justice exclusion is granted.  I find
19    pursuant to the 18 U.S.C. Section 3161(h)(7)(A) that the
20    ends of justice are served by granting the requested
21    continuance, that they outweigh Mr. Dilbar, the public
22    and the government's interest in a speedy trial and a
23    speedy indictment, to allow adequate time for Mr. Dilbar
24    to review with his counsel, Ms. Burger, the initial
25    discovery, and to have conversations with her about how
```

```
 1                USA V. DILBAR GUL DILBAR
 2  he would like to proceed in this matter.
 3            Is there anything else we need to address
 4  right now, Ms. Burger.
 5            MS. BURGER:  No, thank you.
 6            THE COURT:  Ms. McGuire?
 7            MS. MCGUIRE:  No, thank you.
 8            THE COURT:  All right.  Thank you very much,
 9  folks.
10            CERTIFICATE OF REPORTER
11
12    I certify that the foregoing is a correct transcript
13  of the record to the best of my ability of proceedings
14  transcribed from the audio in the above-entitled matter.
15
16  S/ Karen J. Clark,  RPR
17  Official Court Reporter
18
19
20
21
22
23
24
25
```

# Exhibit 4

```
UNITED STATES  DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------x        25-MR-6065(FPG-CDH)
UNITED STATES OF AMERICA,           25-MJ-4055

vs.
                                    Rochester, New York
DILBAR GUL DILBAR, also known as    May 29, 2025
DILBAR GUL TAJ ALI KHAN,            3:00 p.m.
                  Defendant.
--------------------------x
```

**APPEAL OF RELEASE ORDER**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANK P. GERACI
UNITED STATES DISTRICT JUDGE


MICHAEL DIGIACOMO, ESQ.
United States Attorney
BY:  MEGHAN K. MCGUIRE, AUSA
100 State Street
Suite 500
Rochester, New York 14614

FOR DEFENDANT:        MARIANNE MARIANO, ESQ.
                      Federal Public Defender
                      BY:  ANNE M. BURGER, AFPD
                      28 East Main Street
                      Suite 400
                      Rochester, New York 14614

ALSO PRESENT:         KRISTEN NENNI, U.S. PROBATION OFFICER



COURT REPORTER:       Diane S. Martens
                      dmartensreporter@gmail.com

2

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

1          P R O C E E D I N G S

2                  *            *            *

3

4     (Open court, defendant present.)

3:03PM    5     **THE CLERK:**  This is 25-MR-6065, *U.S. v. Dilbar Gul*

6  *Dilbar.*

7     Meghan McGuire is here from the government.

8     Anne Burger is here with defendant.

9     Kristen Nenni is here from probation.

3:04PM   10     Jawaid Samadey is here as the interpreter.

11     Mr. Dilbar appears today for appeal of the Magistrate

12  Judge's decision on release, the government's motion.

13     Mr. Samadey, I'm going to swear you in.  If you would

14  please your right hand, please.

3:04PM   15     (WHEREUPON, interpreter duly sworn.)

16     (WHEREUPON, defendant answering through interpreter.)

17     **THE COURT:**  Good afternoon.

18     Are you Dilbar Gul Dilbar?

19     **THE DEFENDANT:**  Yes.

3:04PM   20     **DEFENDANT DILBAR:**  Yes.

21     **THE COURT:**  This matter's on pursuant to motion by the

22  government as an Appeal to the Release Order issued by

23  Magistrate Judge Holland who found that the government had

24  shown a risk of flight in this case by a preponderance of the

3:05PM   25  evidence; however, that there were conditions, or a set of

3

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:05PM    1   conditions, that could assure the defendant's continued

         2   appearance at proceedings before this court.

         3       Subsequent to that, there was an application for a Stay

         4   of that Release Order.  The Court did deny that Stay based

3:05PM    5   upon the information that the Court had at that time.

         6       Subsequent to that -- yesterday -- the government did

         7   file documents indicating new information that had not been

         8   provided to Judge Holland regarding the defendant indicating

         9   that the defendant does present a risk of flight.

3:06PM   10       Does the government want to be heard?

       11     **MS. MCGUIRE:**  Your Honor, I don't have anything to add

       12   beyond my papers.  I can go through them again or answer any

       13   of the Court's question or I can just give a summation of my

       14   argument, if you like.  But I don't want to regurgitate what

3:06PM   15   you've already obviously read, if it won't be helpful to the

       16   Court.

       17     **THE COURT:**  Well I have a couple questions for you then.

       18     **MS. MCGUIRE:**  Absolutely.

       19     **THE COURT:**  First of all, you indicate that the

3:06PM   20   defendant has some connections to a terrorist organization in

       21   Afghanistan?

       22     **MS. MCGUIRE:**  That's correct.

       23     **THE COURT:**  What is the proof of that?

       24     **MS. MCGUIRE:**  The Haqqani Terrorist Network in

3:06PM   25   particular.  And the proof in the filings that we provided --

4

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:06PM  1      **THE INTREPRETER:**  Your Honor, can I have a repetition of

2      what she said?

3      **THE COURT:**  What's that?

4      **THE INTREPRETER:**  Can you have her repeat that?

3:06PM  5      **THE COURT:**  Yeah, okay.

6      We'll slow down a little bit, too.

7      **MS. MCGUIRE:**  Sorry.

8      Your Honor, we're specifically referencing a connection

9      to an individual named Mohammad Musa Khawrin.  He was a

3:07PM 10      member of what's called the "HIG" in Afghanistan and

11      connected to the Haqqani Network which is a designated

12      Foreign Terrorist Network.  This individual and his brother

13      were also connected to senior Taliban officials.

14      The defendant and this individual had a series of

3:07PM 15      contacts between each other in 2018.  This was at the same

16      time the defendant was reaching out to multiple employers in

17      Afghanistan trying to get letters of employment in order to

18      submit a second fraudulent VISA application.  And the

19      defendant at this time is still Facebook friends with that

3:07PM 20      individual.

21      **THE COURT:**  Okay.  In addition, you had some indication

22      that the defendant had made some contact with individuals

23      from the jail that were related to this organization?

24      **MS. MCGUIRE:**  Not necessarily related to this

3:08PM 25      organization --

5

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:08PM    1       **THE COURT:**  Okay.

          2       **MS. MCGUIRE:**  -- no, your Honor.

          3       **THE COURT:**  You refer to the person as Subject A?

          4       **MS. MCGUIRE:**  Subject A, yes.

3:08PM    5       He's an individual who's residing in the United States.

          6  He's an Afghan National and he's someone that the defendant

          7  repeatedly associates with.  This individual's identity

          8  documents were found in the defendant's residence even though

          9  the individual lives in another place.

3:08PM   10       There were also travel documents in the defendant's

         11  residence that indicated the Subject A had gone back to

         12  Afghanistan from January through March of this year and a

         13  MoneyGram receipt showing that Subject A had sent money back

         14  to Afghanistan in March of this year.  Both of those things

3:08PM   15  were in the defendant's residence.

         16       And then on the defendant's phone, there was another

         17  connection to Subject A:  An image of stacks of $50 bills.  I

         18  think it probably represents around $20,000 cash.  That image

         19  was taken -- that picture was taken at Subject A's residence

3:09PM   20  in Rochester, New York in January of 2025.

         21       **THE COURT:**  Now there are recorded conversations from

         22  the jail; is that right?

         23       **MS. MCGUIRE:**  That's correct.

         24       **THE COURT:**  What was the substance of those

3:09PM   25  conversations?

6

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:09PM | 1     **MS. MCGUIRE:**  We haven't been able to translate them

2   yet.

3     **THE COURT:**  Okay.

4     In addition, the government indicated that the

3:09PM | 5   defendant, although the last proffer was that he had no prior

6   criminal history, that, in fact, you have evidence that he

7   was arrested for impersonating an Afghan National police

8   criminal investigator in 2011, is that correct?

9     **MS. MCGUIRE:**  That's correct.

3:09PM | 10     **THE COURT:**  And do you have any disposition of that

11   particular matter?

12     **MS. MCGUIRE:**  I have no idea if any charges stemmed from

13   it or what the disposition was.  I do know that it became

14   part of his background which is why in 2013 when he tried to

3:10PM | 15   reapply for an interpreter position with the Allied Forces,

16   that application was denied.  He was flagged as a security

17   risk because of the prior arrest.

18     **THE COURT:**  Ms. Burger, do you want to respond?

19     **MS. BURGER:**  Thank you, your Honor.

3:10PM | 20     "While the Bail Reform Act gives Courts considerable

21   discretion regarding methods of presenting information about

22   risk of flight at detention hearings" -- and certainly the

23   rules of evidence do not apply here -- "the exercise of that

24   discretion should reflect an awareness of the high stakes

3:10PM | 25   involved.  Such power should always be exercised with the

7

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:10PM 1    recognition that a pretrial detention hearing may restrict

2    for a significant time the liberty of a presumptively

3    innocent person."  That's from *United States v. Martir*,

4    782 F.2d 1141, pinpoint cite 1145 (2d Cir. 1986).

3:11PM 5        "The Court retains the responsibility for assessing the

6    reliability and accuracy of the government's information at a

7    proffer at a detention hearing."  That's also from *Martir*.

8        I will address the government's new claims in

9    succession.  And I'll acknowledge that we're in the dark here

3:11PM 10   with respect to a lot of the material that was seized.  We've

11   not received any forensic extractions of any devices.  We've

12   not received any recorded phone conversations from the jail.

13   We've not received quite a bit of other information that we

14   think was seized as part of the search in this case.

3:11PM 15       I will, however, reference some additional discovery

16   materials that the government provided a couple of days ago

17   that I think are relevant to these new claims.  First --

18       **THE INTREPRETER:**  Sorry, can you say that again?  It is

19   relevant or not relevant?

3:12PM 20       **MS. BURGER:**  Is relevant to the government's new claims.

21       First, the government's claim is that Dilbar is linked

22   to the Haqqani Network and Hezb-e Islami Gulbuddin, and they

23   identified the Haqqani Network as a designated Foreign

24   Terrorist Organization.

3:12PM 25       So we take that apart.

8

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:12PM    1      The government makes that claim that he is associated or

2    linked (indicating) with this Haqqani Network repeatedly --

3    by my count a total of eight times in their filing.

4      What is the reliability and accuracy of the government's

3:12PM    5    claim that Dilbar is linked to and part of or associated with

6    the Haqqani Network?

7      First, from the government's discovery production and

8    from the government's responses to the Court's questions

9    today, we know that in 2018 Dilbar friended Dr. Khawin and

3:12PM    10    that there were a total of seven contacts from July 28th,

11    2018 to September 4th, 2018.  Contacts, posts, likes.  When

12    was the last post or like?  September 4th of 2018.

13      With a fairly perfunctory Google search I was able to

14    learn that Dr. Khawin has over 34,000 followers on Facebook

3:13PM    15    and in 2018 he was running for office to become a legislator

16    in Afghanistan.  They apparently have a legislative body or

17    had a legislative body that was established in 2005.

18      So he ran for election in 2018 and that was at that time

19    when it sounds like Facebook revealed to the government that

3:13PM    20    these posts or likes took place.

21      He won election by a majority of voters and was elected

22    from the same region that my client and his family are from.

23    This body, this Parliament was elected directly by the people

24    at that time.

3:14PM    25      During his tenure, based on several very quick Google

9

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:14PM 1    searches, it was apparent that Dr. Khawrin stood for a number

2    of different policies including rooting out corruption,

3    identifying fraud and challenging the government when it was

4    making claims that were not worthy of belief.  Unfortunately,

3:14PM 5    the Taliban took control in 2021.  From what I've been able

6    to find, some members of Parliament fled the country, others

7    were killed, and some are still managing to survive in

8    Afghanistan.

9        My point with this information is that a claim that an

3:14PM 10   individual friending a political figure running for election

11   links that person to every other associate or every other

12   entity that that friend likes is patently unreliable.  To

13   suggest that that makes Dilbar associated with, or a member

14   of, the Haqqani Network is ridiculous.

3:15PM 15       Secondly, the government raises a claim that in 2011

16   there was a crime scene of some sort.  I've asked the

17   government whether they know where the crime scene was, what

18   type of crime it was.  There's a reference to "another piece

19   of evidence".  And I understand that some of this information

3:15PM 20   may not be publicly capable of dissemination.  From an email

21   exchange this morning, it's clear that Ms. McGuire does not

22   know, for example, what this other piece of evidence was

23   that's referred to her in her filing.

24       **THE COURT:**  Well it was referred to as some type of a

3:16PM 25   note.

10

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:16PM 1    **MS. BURGER:**  Well, there's a reference, your Honor, to
2    "there's a note found next to another piece of evidence".
3    And so I had asked Ms. McGuire in an email, you know, do you
4    know anything about where this crime took place, what type of
3:16PM 5    crime?  And then, you know, what is this other piece of
6    evidence located next to the note or near the note?  At least
7    this morning Ms. McGuire indicated she did not know.  This
8    afternoon it sounds like at least some portion of that
9    information, she's not at liberty to disclose.

3:16PM 10   **THE COURT:**  Well, she did disclose in her submission it
11   was a handwritten note with the defendant's fingerprints and
12   it contained coordinates for a planned terrorist attack.

13   **MS. BURGER:**  And your Honor will notice that she also
14   references a note "next to another piece of evidence".
3:16PM 15   That's what I was curious about.

16       So, obviously, you know, I'm trying to respond to the
17   government's proffer with limited information.

18       So, first, the government claims that the letters and
19   numbers are "possibly the coordinates of a planned terrorist
3:17PM 20   attack".  So I'm not a geo --

21   **THE COURT:**  She didn't say "possible".  I don't think
22   she put that word in there, did she?

23   **MS. BURGER:**  "Possibly the coordinates of a planned
24   terrorist attack".  And I apologize, your Honor, if I'm wrong
3:17PM 25   about that.  I'll look right now and see if I made a mistake

11

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:17PM   1   in my notes.

2        **MS. MCGUIRE:**  I think I did say "possibly".

3        **THE COURT:**  Okay, thank you.

4        **MS. MCGUIRE:**  Yeah.

3:17PM   5        **MS. BURGER:**  Now I'm having trouble finding it.

6        Yes.  "Possibly the coordinates of a planned terrorist

7   attack".

8        So I've had a chance through the production of some

9   discovery material to have a look at what I understand the

3:17PM  10   note is -- and, again, I'm not a geographer.  I've seen

11   coordinates plenty of times before.  These are not

12   coordinates (indicating).  We're looking at a combination of

13   numbers and some letters.  There are a couple of words.

14   There's another area where they're just numbers.  You know,

3:18PM  15   coordinates are usually, you know, 41.3985, 2.17403, for

16   example, or 41 degrees, 24 feet, 12.2 inches, so on.  I think

17   the Court gets the idea.  There is no way that these are

18   coordinates (indicating).

19        And so my argument is that it's a completely unreliable

3:18PM  20   claim that these are possibly the coordinates of a terrorist

21   attack.

22        What about the government's claim that Dilbar's

23   fingerprint was on the note?  I'm, I'm in a vacuum here, your

24   Honor, in terms of what type of analysis was done here, what

3:18PM  25   type of crime was being investigated.

12

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:18PM 1    I mean, with a couple of fairly quick searches I was

2    able to identify another case where the government disavowed

3    a hit from this -- the same biometric system that runs on

4    algorithms.  I think the government claimed that a false

3:19PM 5    positive was due to some sort of contamination.  But, again,

6    I'm sort of flying blind here because I do not have complete

7    information as the government does.

8        From what I can tell -- actually I can't, I can't really

9    even tell if this is a -- the crime is a domestic crime

3:19PM 10   occurring in Afghanistan or something more serious.

11       What's the reliability and accuracy of the government's

12   claim that Dilbar engaged in criminal conduct by posing as an

13   Afghan national police investigator?

14       So, in response to the Court's questions, the government

3:19PM 15   took the position they, you know, don't know whether charges,

16   criminal convictions, things like that resulted.  And that's

17   consistent with their filing.

18       The report that the government disclosed that I think

19   this information comes from, from U.S. Central Command, says

3:20PM 20   there was information that Dilbar was detained in 2011 for

21   impersonating an Afghan national police criminal

22   investigator.  "However, no additional reporting could be

23   found that corroborates that information."

24       So the Rear Admiral of the Navy, Deputy Director of

3:20PM 25   Operations, in his report apparently undertook a search to

13

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:20PM   1   try to ferret out this information, the source of it,

2   additional reporting, additional information, and in his

3   report says "no additional reporting could be found that

4   corroborates that information."

3:20PM   5        What's the reliability and accuracy of the government's

6   claim that Dilbar has access to vast troves of money with

7   which he could easily purchase tickets, fake IDs and flee the

8   country?

9        So the MoneyGram receipt that's referenced by the

3:21PM  10   government represents a payment of $430 to somebody in

11   Afghanistan, a name that I don't recognize.  It doesn't

12   appear to me from the photograph the government provided,

13   doesn't appear to reflect Mr. Dilbar's name or his family's

14   name.

3:21PM  15        The photograph of the cash?  Again, we don't have the

16   phone so we haven't been able to undertake any sort of a

17   analysis of the origin of the photograph.  We know that it

18   was not taken by the phone that the government associates

19   with Dilbar.  It was taken by an iPhone 15.  We do know that

3:21PM  20   the image, according to the government's report, was found on

21   Dilbar's phone but, again, we know that it was not taken by

22   Dilbar's iPhone 16.

23        What do we know?  We know that he's been out on release

24   for the past almost two weeks, give or take.  We know that he

3:22PM  25   works 10-hour overnight shifts to provide for himself, his

14

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:22PM 1  wife and their five children.

2  By the way, I know the government made something of the

3  purchase of iPhones and Apple watches and then two Android

4  phones.  The couple has five children.  The three older ones,

3:22PM 5  prior to his arrest, would frequently like to watch cartoons

6  on the parents' phones.  So it made caring for five children

7  a whole lot easier to have multiple small screens.

8  Obviously they don't have those phones.  Those phones

9  have been seized.

3:22PM 10  So the two Android phones were purchased for Dilbar and

11  his wife by Mr. Hough, the third-party custodian.  Mr. Hough,

12  wanting to be entirely aboveboard, clarified that and ran

13  that by U.S. Pretrial before he did so.  In lengthy

14  discussions over the course of I would say hours, Mr. Hough

3:23PM 15  and Dilbar have spent time talking to pretrial, making sure

16  that the rules are understood, that the rules are followed.

17  And it was Mr. Hough who purchased those two Android phones

18  to insure that Dilbar could reconnect with his work.  The big

19  concern was that he had this great job and the job would be

3:23PM 20  gone if he couldn't reconnect with them.

21  We know they live modestly.  Did they spend a lot of

22  money on iPhones and Apple watches?  Sure.  They did.

23  They're also savers.  They had just over $6,000, I think

24  it was $6,001 in their savings account.  And they had, if I

3:23PM 25  recall correctly, about 1,200 or so in their operating

15

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:23PM 1 account, their checking account. Their rent is just over a

2 thousand dollars a month. They live modestly.

3 The two oldest children are very good at English. They

4 are now acclimated. The three oldest children attend local

3:24PM 5 school. The youngest is a one-month-old. There's a

6 one-year-old at home.

7 As the Court's aware, Dilbar's wife is also trying to

8 connect with the community and trying to get her driver's

9 license. She has her permit.

3:24PM 10 **THE INTREPRETER:** Can you say that again about the wife?

11 **MS. BURGER:** She has her driver's permit.

12 As every court appearance has been, this appearance is

13 attended by people from the community who have known Dilbar

14 and his family since they arrived and who are here to show

3:24PM 15 support for them.

16 I can tell you that I certainly made a point of

17 explaining the government's allegations, these new

18 allegations, to people who are supporting Dilbar, and they're

19 here still supporting him.

3:24PM 20 Mr. Hough lives a scant mile away, and is in constant

21 contact with Dilbar.

22 With respect to the conditions themselves, I can update

23 the Court about what has taken place since Dilbar's release.

24 He's living in his approved residence. David Hough -- who's

3:25PM 25 here in court, who drove Dilbar to court today -- is in

16

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:25PM    1    constant contact with Dilbar and his supervising pretrial

          2    officer.

          3        He reports as directed.

          4        A $6,000 cash bond was presented to the Court by way of

3:25PM    5    a Power of Attorney that Dilbar executed permitting Mr. Hough

          6    to access the family savings account.

          7        As the government made clear, identity documents,

          8    passports were collected, were confiscated by the government.

          9    In the interim, the youngest child, a one-month-old, her

3:25PM   10    passport arrived in the mail and that was immediately

         11    surrendered to Mr. Hough and is now in the custody of the

         12    Clerk of Court.

         13        No one has attempted to obtain any sort of international

         14    travel document.

3:26PM   15        He's required to remain in Monroe County.  Remain at a

         16    verifiable address.  He continues to live in the very same

         17    home that he and his wife and children have lived in for last

         18    year.

         19        He is prepared to submit to a mental health evaluation

3:26PM   20    and treatment.  He's awaiting a referral from pretrial for

         21    that to take place.

         22        He has no weapons.

         23        He's not drinking alcohol, nor has he ever drunk

         24    alcohol.

3:26PM   25        The Court's aware that he is subjected to electronic

17

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:26PM 1 monitoring, home detention.  He at all times is in his home

2 except for work, personally, religious services, court

3 appearances, and up to this point my understanding is none of

4 the children have had a doctor's appointment.  But he's the

3:26PM 5 only driver in the household and when they have an

6 appointment, he will provide notice to pretrial so he can

7 take the kids to those medical appointments.

8 The electronic monitoring is not just home detention.

9 It also comes with location monitoring:  Identifying where he

3:27PM 10 is.

11 He has begun the process of providing passwords and

12 other information to pretrial that will assist them in

13 monitoring just about every aspect of his life.  With his

14 permission and with his signature, we have withdrawn his

3:27PM 15 application for a security guard license from New York State

16 and he has executed an Irrevocable Waiver of Extradition.

17 He has been in full compliance with these very stringent

18 conditions of release and he will continue to abide by these

19 conditions.

3:27PM 20 Judge Holland got it right.

21 I understand the government is presenting what appears

22 to be very fantastic, very inflammatory allegations here.

23 I'm simply asking your Honor to assess the true

24 reliability of the claims and, in doing so, you should uphold

3:28PM 25 Judge Holland's determination and allow Dilbar to remain on

18

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:28PM  1   release under the same conditions.

2   **THE COURT:**  Thank you.

3   Pretrial, can you just give me an update?

4   **PROBATION OFFICER NENNI:**  Yes, your Honor.

3:28PM  5   Our office, to our knowledge there hasn't been any

6   instances of noncompliance thus far.  He is placed on

7   location monitoring.  He has been enrolled in computer

8   monitoring services.  And thus far we haven't had any issues.

9   **THE COURT:**  Is he employed?

3:28PM 10   **PROBATION OFFICER NENNI:**  Yes, your Honor.  He works at

11   Amazon, I believe, as a training coordinator.

12   **MS. BURGER:**  Your Honor, if I could add something I

13   neglected to.

14   What we've noticed with the monitoring software is that

3:29PM 15   there is no Facebook or WhatsApp access now on the monitored

16   device that Dilbar uses.  So to the extent that there is some

17   concern that he will get into Facebook or WhatsApp, those are

18   not accessible with the monitoring software on his phone.

19   **THE COURT:**  Okay.

3:29PM 20   **MS. MCGUIRE:**  Your Honor, if I could just clear up a

21   couple of points.

22   **THE COURT:**  Sure.

23   **MS. MCGUIRE:**  First with respect to the other piece of

24   evidence that was found with the note that had the

3:29PM 25   defendant's fingerprint on it.  I know what it is.  I have

19

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:29PM 1  always known what it is.  I can't disclose what it is but I

2  can highlight to the Court that it was turned over to the

3  FBI's Terrorism and Explosive Devices Analytical Center.

4      With respect to the note itself, those are coordinates.

3:29PM 5  They're Military Grid Reference System coordinates.  They are

6  letters and numbers.  That's what those look like.

7      **THE COURT:**  That is the note that had the fingerprint of

8  Mr. Dilbar?

9      **MS. MCGUIRE:**  That's correct.

3:30PM 10      **THE COURT:**  Okay.

11      **MS. MCGUIRE:**  With respect to the prior arrest, the

12  Naval officer who signed the paper that declassified that

13  information didn't undergo any kind of extra investigation to

14  try and determine additional evidence.  He was simply

3:30PM 15  declassifying that piece of information.

16      And then just, in general, your Honor, as you know from

17  the transcript, Judge Holland specifically said this was not

18  an easy or clearcut decision and that was when she believed

19  that this defendant had no criminal history, low Guidelines

3:30PM 20  exposure, and modest financial resources.

21      That's why the government has focused in this case on

22  introducing facts that rebut each of those assumptions.

23      We have shown that the defendant does have a criminal

24  history that identified him as a security risk.  And if he

3:31PM 25  had been forthright about his identity and his employment

20

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:31PM 1    history in his VISA applications, he would have been flagged

2    as inadmissible and never would have been let into this

3    country.  He should not be here at all because he's a

4    security risk.  And that's what makes him right now pending

3:31PM 5    this case, a security risk and a risk of flight and why he

6    needs to be detained.

7        **MS. BURGER:**  Your Honor, if I could respond?

8        **THE COURT:**  Sure, go ahead.

9        **MS. BURGER:**  Sure.

3:31PM 10        So, you know, I understand, you know, the government's

11    claim.  It was sort of what they alluded to, although didn't

12    take that next step, at the hearing in front of Judge

13    Holland.

14        The government has yet to act.  If the government

3:31PM 15    believes that Dilbar is engaged in VISA fraud in conjunction

16    with potential terrorist activity, it can immediately, when

17    it has probable cause, file a Criminal Complaint and then he

18    will be back in front of the Magistrate on a far more serious

19    charge.  That hasn't happened.

3:32PM 20        What also hasn't happened for it sounds like about 10

21    years or 15 years is, in spite of having the note and I guess

22    this biometric fingerprint, there was no effort that, that

23    I've been made aware of to arrest Dilbar in Afghanistan.  I

24    mean, I guess I have more questions than I have answers, your

3:32PM 25    Honor.  And I think that in that, in that context, the fact

21

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:32PM 1    of pointing out we had this hit, if it's never acted upon,

2    seriously calls into question its reliability.

3         With respect to modest financial resources, the

4    government's proffered that someone who's friends with Dilbar

3:32PM 5    took a photograph of a lot of money and that picture is on

6    Dilbar's phone, that is, I think, completely -- I think it's

7    irrelevant.  It -- it utterly lacks reliability.  It does not

8    support the government's proposition that he has anything

9    other than very modest financial resources, in fact, even

3:33PM 10   less modest given the $6,000 bond that was posted.

11        **THE COURT:**  My understanding right now the government

12   has charged the defendant with VISA fraud; is that correct?

13        **MS. MCGUIRE:**  That's correct.

14        **THE COURT:**  But there's a potential for an upgraded

3:33PM 15   charge to VISA fraud with the intent to facilitate an act of

16   international terrorism?

17        **MS. MCGUIRE:**  That's correct.

18        **THE COURT:**  And is that pending?  Is that --

19        **MS. MCGUIRE:**  That has not been charged at this time.

3:33PM 20        **THE COURT:**  Is there any intent to pursue that?

21        **MS. MCGUIRE:**  Based on the evidence we have right now,

22   no.

23        **THE COURT:**  And based upon that, the defendant still

24   continues to face a Guideline sentence of zero to 6 months?

3:34PM 25        **MS. MCGUIRE:**  As it's currently charged.  I would have

22

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:34PM 1 | to look if there are any other applicable enhancements.

2 | There is a cross-enhancement for committing VISA fraud in

3 | furtherance of any other felony and when that occurs, then

4 | the Guideline applicable to that other felony becomes the

3:34PM 5 | Guideline range.

6 | So, there are things that we are looking at from our

7 | search warrant returns which we're still going through

8 | because, again, a lot of it was not in English where we may

9 | be able to prove for Guideline purposes that he came to the

3:34PM 10 | United States to commit a separate felony that would enhance

11 | the Guidelines substantially.

12 | **THE COURT:** Okay. But you don't have any proof of that

13 | now?

14 | **MS. MCGUIRE:** I do not have enough proof to charge.

3:34PM 15 | **THE COURT:** Okay.

16 | Anything else you want to add?

17 | **MS. BURGER:** No, thank you.

18 | **THE COURT:** Anything else, Ms. McGuire?

19 | **MS. MCGUIRE:** No, thank you.

3:35PM 20 | **THE COURT:** Okay.

21 | There are certain factors that we, I think everybody

22 | agrees to.

23 | The defendant is 33 years of age.

24 | He's married.

3:35PM 25 | Has five children: Ages 7, 6, 5, 1, and as of last

23

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:35PM 1 appearance, 1 month.  Obviously older now.

2 Lives on Blossom Road in the city of Rochester.

3 Is a high school graduate.

4 Upon his arrest, his passport was seized.

3:35PM 5 This indicated he had a REAL New York State

6 identification.  Has than been ceased as well?

7 **MS. BURGER:**  He doesn't -- Judge, he has a regular New

8 York State driver's license, not the kind -- it's a REAL ID

9 but it's not an enhanced license that allows him to travel

3:35PM 10 across the border into Canada or Mexico.

11 **THE COURT:**  Indicates that he's employed at Amazon.

12 There were some discrepancy regarding his employment in

13 Afghanistan.  It's clear that everybody agrees he was a

14 translator for some period of time.  However there was

3:36PM 15 also --

16 **MS. BURGER:**  I think that was -- I'm sorry, your Honor.

17 I think that was cleared up.  There was a reference to

18 him being a pharmacist.  And I think that Ms. McGuire in a

19 previous filing acknowledged that in one application in the

3:36PM 20 past, that that had been included, there had been a reference

21 to work as a pharmacist.

22 **MS. MCGUIRE:**  Right.  But that was still a lie.  He was

23 not a pharmacist.  He had conflicting backgrounds regarding

24 his employment in various different applications.  In front

3:36PM 25 of the Magistrate Judge I said that none of those

24

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:36PM 1    applications included the term "pharmacist".  Afterwards we

2    found one that did.

3        But it's inconsistent with more recent ones where it

4    said that he was working as a printer and had a high school

3:36PM 5    level education.  So there was only one time in all the

6    applications where he claimed to be a pharmacist.  He also

7    specifically checked the box "no" when asked if he had any

8    specialized medical training.  So that's a lie that for some

9    reason he is persisting in to this day.

3:37PM 10   **THE COURT:**  This is a motion to revoke the Magistrate

11   Judge's release order.  It's a de novo review.

12       I did review the transcript of the previous proceeding,

13   considered the information provided there.  As well as the

14   filings by the parties and obviously the information provided

3:37PM 15   today by both of the parties.

16       The defendant is charged with VISA fraud which

17   apparently carries at this point a Guideline sentence of

18   zero to 6 months that could be upgraded if, in fact, there's

19   evidence that the VISA fraud was created in concert with

3:37PM 20   another felony or even further upgraded if, in fact, the

21   fraud was to facilitate an act of international terrorism.

22       The record indicates that in 2013 the defendant did

23   apply for another interpreter position but was denied that

24   due to his 2011 arrest.

3:38PM 25       Judge Holland was not advised about this 2011 arrest

25

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:38PM 1 which was for impersonating an Afghan national police

2 criminal investigator.

3 In April 2024, the defendant did move to the United

4 States.

3:38PM 5 Did obtain a Green Card based upon this VISA application

6 which the government alleges was based upon fraudulent

7 information which included letters from individuals

8 falsifying the defendant's employment in Afghanistan. I

9 believe there were two separate indications of such

3:39PM 10 employment.

11 The defendant was charged through a Criminal Complaint

12 and, as Judge Holland did indicate, obviously VISA fraud is a

13 nonviolent crime.

14 The government has also indicated that this is a very

3:39PM 15 serious crime based upon the fact that it opens up potential

16 for all types of different mischief.

17 The government did move for detention on the basis of

18 risk of flight and it continues not to make an application

19 for danger to the community, is that correct?

3:39PM 20 **MS. MCGUIRE:** Your Honor, I'm arguing that the Section G

21 factor of danger is relevant but under subsection (f), my

22 grounds for moving, I'm limited to risk of flight.

23 **THE COURT:** Okay. So it is limited to the risk of

24 flight.

3:40PM 25 In the Title 18, Section 3142(g) factors include the

26

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:40PM 1  nature and circumstances of the offense.

2       In this case, I don't think anybody disputes that there

3  is sufficient evidence that this is a serious matter, as

4  Judge Holland did in her determination.

3:40PM 5       Secondly, the weight of the evidence in this case

6  appears also to be relatively strong in the matter.

7       The history and character of the defendant is a factor

8  to be considered as well.

9       And at the time of the presentation before Judge

3:40PM 10  Holland, there was no indication of any connection whatsoever

11  with Foreign Terrorist Organizations or a prior criminal

12  history of the defendant.  That has now been brought to the

13  Court's attention.

14       The Court has to consider the defendant's physical and

3:41PM 15  mental conditions.

16       His family ties.  He does have five children here in

17  this community.  His length of time in the community has not

18  been in the Rochester community for a very long period of

19  time.

3:41PM 20       There does not appear to be any history of alcohol or

21  drug abuse.

22       One of the factors that Judge Holland did consider was a

23  lack of a criminal history.

24       And that is a changed circumstance that I find to be

3:41PM 25  very significant in this case.

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:41PM 1    The Court did find -- and I find as well -- that there

2    is sufficient evidence by preponderance of the evidence that

3    the defendant does present a risk of flight.

4    The question then becomes whether or not there are

3:42PM 5    conditions, or a set of conditions, that would assure his

6    returning to court.

7    Judge Holland did set a number of conditions that the

8    Court did find sufficient when in the request for the Stay

9    including home detention with electronic location monitoring:

3:42PM 10    A restriction to the defendant's travel.

11    A requirement that the defendant allow monitoring of any

12    computer equipment.

13    A requirement that he undergo a mental health

14    evaluation.

3:42PM 15    That he post $6,000 cash bond.

16    That he withdraw his application for a security

17    license -- which my understanding he has done.

18    That he surrender any passport or any other documents

19    that would allow any international travel.

3:43PM 20    That he execute a Waiver of Extradition.

21    Not consume any alcohol.

22    Not possess any firearms.

23    That a third-party custodian would be appointed, David

24    Hough.  And he was appointed.

3:43PM 25    Is David Hough here?

28

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:43PM    1    **MR. HOUGH:** (Indicating.)

2    **MS. BURGER:** He is, Judge.

3    **THE COURT:** Could you spell your name for me.

4    **MR. HOUGH:** H-O-U-G-H.

3:43PM    5    **THE COURT:** Can you tell me any new reports regarding

6    this time that Mr. Dilbar has been released?

7    **MR. HOUGH:** I'm sorry, any what?

8    **THE COURT:** Any reports regarding his conduct?

9    **MR. HOUGH:** Nothing outside of his requirements, sir,

3:43PM    10    no.

11    **THE COURT:** And how often do you see him?

12    **MR. HOUGH:** Sometimes too often. Often, I say probably

13    four out of five days a week.

14    **THE COURT:** Okay. And you live close to him?

3:43PM    15    **MR. HOUGH:** Yes. He lives on Blossom. I'm the next

16    exit up north on Browncroft.

17    **THE COURT:** Okay.

18    And all the other standards of conditions were applied

19    by Judge Holland as well.

3:44PM    20    **MR. HOUGH:** Yes.

21    **THE COURT:** The newly discovered evidence in this case

22    is the government's proffer that the defendant does have some

23    connection or link to a Foreign Terrorist Organization. That

24    was previously classified information that has been

3:44PM    25    declassified in order to notify the Court of that particular

29

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:44PM 1    information. That the Terrorist Explosive Device Analytical

2    Center did provide that information.

3       In addition, there was some evidence here that the

4    defendant was connected to some handwritten note with some

3:44PM 5    coordinates for a proposed planned terrorist attack that did

6    contain the defendant's fingerprints.

7       In addition, the 2011 arrest in Afghanistan for

8    impersonating Afghan national police criminal investigator.

9       And prior to his release, while at the Monroe County

3:45PM 10    jail, it's my understanding that the defendant made several

11    contacts with individuals related to conduct in Afghanistan

12    referred to as Subject A on May 1st, May 2nd, and a different

13    individual on May 1st, May 2nd, May 3rd, three different

14    occasions on May 6th, and also on May 10th. And interesting

3:45PM 15    that there was no contact apparently with the defendant's

16    wife until May 7th.

17       Again, Mr. Hough, when were you contacted by Mr. Dilbar?

18    **MR. HOUGH:** Through the jail?

19    **THE COURT:** Yes.

3:46PM 20    **MR. HOUGH:** I would have to look at my phone.

21    **THE COURT:** This indicates not until May 10th, would

22    that be correct?

23    **MR. HOUGH:** Possibly. It took a little while for us to

24    figure out the system and how it worked and get money posted

3:46PM 25    so he can call (indiscernible).

30

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:46PM | 1 |    **THE COURT:**  Do what?

2 |    **MR. HOUGH:**  It took us quite a while to figure out the

3 | system and how to get money posted to his account so he can

4 | call us.

3:46PM | 5 |    **THE COURT:**  The Court finds that in this case the

6 | government has shown sufficient proof by a preponderance of

7 | the evidence that the defendant does present a risk of flight

8 | based upon the lack of information previously provided to

9 | Judge Holland including the defendant's association with

3:46PM | 10 | organizations in Afghanistan, a prior criminal arrest, and

11 | some rather curious phone calls from the Monroe County jail

12 | to individuals not related to his family.

13 |    The Court finds that there are no conditions, or set of

14 | conditions, that would guarantee the return of the defendant

3:47PM | 15 | to court; and, thereby, order that he be detained.

16 |    **MS. BURGER:**  Your Honor, just for record purposes, the

17 | Court is finding that my client has a link to an FTO, or

18 | foreign terrorist organization?

19 |    **THE COURT:**  Well --

3:47PM | 20 |    **MS. BURGER:**  Is that correct?

21 |    **THE COURT:**  Well, there's information regarding his

22 | connection --

23 |    **MS. BURGER:**  Also --

24 |    **THE COURT:**  -- to that --

3:47PM | 25 |    **MS. BURGER:**  Also that --

31

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:47PM 1    **THE COURT:** -- foreign terrorist organization.

2    **MS. BURGER:** And the Court mentioned that the note with

3    coordinates did relate to a potential terrorist attack --

4    **THE COURT:** Well that --

3:47PM 5    **MS. BURGER:** -- before making that finding?

6    **THE COURT:** That was a previous incident in two thousand

7    and...

8    **MS. MCGUIRE:** '11, your Honor.

9    **THE COURT:** '11.

3:48PM 10    **MS. MCGUIRE:** And I believe what you said was that it

11    was provided to the Terrorist Explosive Devices Unit. You

12    didn't find on the record that it was related to a terrorist

13    attack.

14    **THE COURT:** Yes.

3:48PM 15    **MS. BURGER:** So your Honor is not concluded that the

16    note related to a terrorist attack?

17    **THE COURT:** That's correct.

18    **MS. BURGER:** And with respect to the jail conversations,

19    there was no content proffered. Your Honor --

3:48PM 20    **THE COURT:** Yes, they indicated that they could not

21    interpret the conversations.

22    **MS. BURGER:** Your Honor's drawing a conclusion that

23    those conversations related to conduct in Afghanistan?

24    **THE COURT:** No, it was a subject. It was an individual

3:48PM 25    who was connected with activities in Afghanistan.

32

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:48PM     1      Is that correct --

           2          **MS. MCGUIRE:**  Right.

           3          **THE COURT:**  -- Subject A.

           4          **MS. MCGUIRE:**  The person who -- one of the people he

3:48PM     5      called, the person he called for the first two days -- three

           6      times in the first two days had recently traveled back to

           7      Afghanistan and was an Afghan national and had sent money to

           8      Afghanistan within this year.

           9          **THE COURT:**  Okay.

3:48PM     10         **MS. BURGER:**  And so the Court's concluding that the

           11     content or the purpose of those calls related to activity

           12     between that individual and Afghanistan?

           13         **THE COURT:**  No, I just think it's rather suspicious that

           14     the defendant is making contact with an individual connected

3:49PM     15     with Afghanistan over a number of dates -- multiple

           16     contacts -- before he even contacts his family.  And that

           17     raises suspicion for me that also increases, I think, the

           18     risk of his potential flight.

           19         **MS. BURGER:**  With respect to the conclusion, your Honor

3:49PM     20     referenced that the detention in 2011 was very significant in

           21     the Court's findings of fact.

           22         **THE COURT:**  All the factors are significant.

           23         **MS. MCGUIRE:**  Judge, all this is going to be in the

           24     transcript.  I know that this is probably for the purposes of

3:49PM     25     putting together an appeal.  But what you order and your

33

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:50PM    1   findings, you've said already.  So I think maybe we can just

2   conclude and let the transcript say what you said.

3        **THE COURT:**  I'll allow Ms. Burger to speak.

4        **MS. MCGUIRE:**  Okay.

3:50PM    5        **MS. BURGER:**  Thank you, your Honor.  One final issue.

6       I noticed that after the government had filed its reply,

7   it was available on Pacer for a time.  And then I noticed

8   that there was a docket entry where there was a direction

9   that it should be sealed.  Did --

3:50PM   10        **THE COURT:**  Yeah, the Court directed that direction.

11   Based upon the information there, I wasn't sure, quite

12   frankly, that people wanted this disseminated.  If nobody

13   wants it sealed, it can be unsealed.

14       What's your position on that?

3:50PM   15        **MS. BURGER:**  I think there's a presumption of openness

16   with respect to court records, your Honor.

17        **MS. MCGUIRE:**  No objection.

18        **THE COURT:**  No objection.

19       It will be unsealed.

3:50PM   20        **MS. MCGUIRE:**  Thank you.

21        **MS. BURGER:**  So that was not a request by the

22   government --

23        **MS. MCGUIRE:**  It was not.

24        **MS. BURGER:**  -- for that sealing?

3:50PM   25        **THE COURT:**  No, it was not.  The Court did that.  Based

34

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:50PM  1   upon that information, I thought that counsel should have

2   that information and I'm not sure that it should have been

3   readily available to the community.  I was, quite frankly,

4   surprised it wasn't filed under seal to begin with.

3:51PM  5       **MS. BURGER:**  Understood.

6       **THE COURT:**  Okay.

7       Thank you.

8       **MS. MCGUIRE:**  Thank you.

9       (WHEREUPON, proceedings adjourned.)

35

U.S. v. Dilbar - 25-MR-6065/25-MJ-4055

3:51PM 1

2                    *          *          *

3              CERTIFICATE OF REPORTER

4

3:51PM 5        In accordance with 28, U.S.C., 753(b), I

6  certify that these original notes are a true and correct

7  record of proceedings in the United States District Court

8  of the Western District of New York before the

9  Honorable Frank P. Geraci on May 29, 2025.

3:51PM 10

11

12  S/ Diane S. Martens

13  Diane S. Martens, FCRR, RPR
    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25